**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE ENGAGESMART, INC. SECURITIES LITIGATION | Case No. 24-cv-1083-SB<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

TABLE OF CONTENTS


INTRODUCTION .......... 2

PARTIES .......... 11

A. Plaintiffs .......... 11

B. Defendants .......... 12

1. Defendant EngageSmart .......... 12

2. The Special Committee Defendants .......... 12

3. The Board Defendants .......... 13

4. The Officer Defendants .......... 15

5. Defendant General Atlantic .......... 15

6. Defendant Vista .......... 16

C. Relevant Nonparty .......... 17

I. FACTUAL BACKGROUND .......... 17

A. General Atlantic's Ownership and Governance Rights Over EngageSmart .......... 17

B. Following EngageSmart's IPO, General Atlantic Attempts to Liquidate a Portion of Its Investment .......... 19

C. EngageSmart Sets Up a Conflicted Special Committee, But Vista Backs Away .......... 22

D. General Atlantic Continues Its Pursuit of Liquidity .......... 25

E. General Atlantic and Goldman Restart the Sales Process with an Understanding That Maximizing the Purchase Price Is Not in General Atlantic's Best Interests .......... 26

F. EngageSmart Retains Conflicted Goldman and Reconstitutes the Conflicted Special Committee, Which Retains Conflicted Evercore .......... 29

G. The Special Committee "Approves" the Script and Buyer List that Severely Limited the Potential Bidders .......... 32

H. Despite Conducting Outreach Exclusively for Minority Investments, General Atlantic and EngageSmart Privately Inform Vista That It Would Consider a Majority Investment .......... 34

I. Goldman and General Atlantic Purposely Keep the Special Committee and Evercore in the Dark ..... 35

J. Evercore Again Pushes to Explore A Majority Sale, But General Atlantic Refuses ..... 37

K. Bid Day Comes and Vista Gets More Inside Information ..... 40

L. Francisco Partners "Prefers" A Majority Deal and Complains About the Lack of Diligence ..... 42

M. Vista Follows Its Well-Known and Anticipated High-Pressure Acquisition Strategy ..... 43

N. Evercore Is Excluded From Communications While Vista Capitalizes On Its Inside Information and Makes A Majority Deal Proposal ..... 44

O. Vista's Bid is Accepted in Just Three Days Despite the Fact That Other Bidders Were Not Given the Chance to Compete for a Majority Position ..... 47

P. After the Go-Shop Fails, Defendants File a Materially Misleading Proxy Statement, and the Merger Is Approved ..... 52

II. DEFENDANTS' VIOLATIONS OF THE EXCHANGE ACT ..... 54

A. False or Misleading Statements or Omissions of Material Facts in the October 2023 Merger Press Release ..... 54

B. False or Misleading Statements or Omissions of Material Facts in the December 19, 2023 Definitive Proxy ..... 59

1. False and Misleading Statements or Omissions of Material Facts Concerning the Fairness of The Merger Process ..... 59

2. False and Misleading Statements or Omissions of Material Facts Concerning Alternative Bidders ..... 63

3. False and Misleading Statements or Omissions of Material Facts Concerning General Atlantic's Desire for Liquidity as a Motivating Factor ..... 65

4. False and Misleading Statements or Omissions of Material Facts Concerning Goldman's Conflicts ..... 67

5. False and Misleading Statements or Omissions of Material Facts Concerning the Special Committee's Independence ..... 69

6. False and Misleading Statements or Omissions of Material Facts Concerning the Non-Ratable Secret $505 Million Post-Closing Dividend To General Atlantic ..... 70

7. The Omission of the Post-Closing Dividend and Other Arrangements Rendered the Entire Proxy Misleading ..... 71

C. False or Misleading Statements or Omissions of Material Facts in the December 19, 2023 Schedule 13E-3 by EngageSmart, General Atlantic, and Vista ..... 73

III. ADDITIONAL ALLEGATIONS OF SCIENTER ..... 73

A. General Atlantic Was Motivated to Keep the Merger Price Low ..... 74

B. General Atlantic and Summit's Needs for Liquidity Knowingly Impacted Deal Negotiations and Provided a Motive to Accept a Suboptimal Deal While Keeping Unaffiliated Stockholders in the Dark ..... 75

C. General Atlantic's Rollover of Equity Was Extremely Valuable ..... 77

D. General Atlantic, EngageSmart, and the Special Committee Knew the Special Committee Did Not Control the Sales Process or Negotiations ..... 77

E. The Special Committee Knew the Process was Unfair Because it Allowed Vista to Restore its Prior Files, Which Provided More Comprehensive Data Than the 2023 Process, and Knew that General Atlantic Separately Negotiated a Non-Ratable Benefit for Itself ..... 78

F. The Special Committee and General Atlantic Ignored Evercore's Advice to Test the Market for Majority Interest ..... 78

G. Francisco Partners Was Disappointed They Were Never Informed That a Majority Deal Was on the Table ..... 79

H. CEO Bennett Was Motivated to Sell the Company to Vista Because a Majority Deal Qualified as a Change in Control, Entitling Bennett and Other Executives to Lucrative Payments ..... 79

IV. LOSS CAUSATION ..... 82

V. INAPPLICABILITY OF STATUTORY SAFE HARBOR ..... 85

VI. CLASS ACTION ALLEGATIONS ..... 85

VII. PRESUMPTION OF RELIANCE ..... 87

COUNT I Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder ..... 90

COUNT II Against All Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder ........ 92

COUNT III Against Vista, General Atlantic, EngageSmart, McKenzie, Mangum, Osnoss, and Stamas, for Violations of Section 10(b) and Rules 10b-5(a) and 10b-5(c) thereunder ........ 94

COUNT IV Against the Special Committee Defendants, Board Defendants, Officer Defendants, and General Atlantic for Violations of Section 20(a) of the Exchange Act ........ 96

VIII. PRAYER FOR RELIEF ........ 98

IX. JURY DEMAND ........ 99

AltShares Event-Driven ETF, The Arbitrage Fund, and the Hilary L. Shane Revocable Trust (together, "Plaintiffs") bring this class action (the "Class Action") for violations of:

(i) 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9 promulgated thereunder, on behalf of themselves and other public holders of EngageSmart, Inc. ("EngageSmart" or the "Company") common stock (the "Unaffiliated Stockholders") as of the December 21, 2023 record date (the "Record Date") who were entitled to vote on the "take-private" acquisition (the "Merger") of the Company by Vista Equity Partners Management, LLC and its affiliates (collectively, "Vista"); and

(ii) Sections 10(b) and 20(a) of the Exchange Act, §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder, on behalf of themselves and all other persons or entities (excluding Defendants, defined more fully below) who sold shares of EngageSmart common stock from October 23, 2023, the announcement date of the Merger, through the close of the Merger on January 26, 2024 (the "Class Period"), including those who sold into the Merger and were damaged thereby (together with the Unaffiliated Stockholders, the "Class" or "Class Members").

These claims are variously asserted against: (i) EngageSmart; (ii) the Company's board of directors (the "EngageSmart Board" or "Board Defendants"); (iii) the special committee of the EngageSmart Board purportedly established to oversee the sales process resulting in the Merger (the "Special Committee" or "Special Committee Defendants"); (iv) certain Company executives (the "Officer Defendants" and, together, with EngageSmart, the Board Defendants and Special Committee Defendants, the "EngageSmart Defendants"); (v) General Atlantic, L.P. and its affiliates ("General Atlantic"), EngageSmart's former majority and controlling shareholder and a current 35% owner of EngageSmart following the completion of the Merger; and (vi) Vista, which acquired a majority interest in EngageSmart through the Merger and is a current 65% post-Merger owner of EngageSmart (all together, the "Defendants").

Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based upon the ongoing investigation by undersigned counsel, including review and analysis of: (i) public filings by EngageSmart,

General Atlantic, and Vista; (ii) press releases and other public statements; (iii) media and analyst reports about the Company; (iv) unredacted pleadings, briefing, argument and other documents produced to Plaintiffs following a challenge to confidential treatment filed under Delaware Chancery Rule 5.1 in the cases captioned *In re EngageSmart, Inc. Stockholder Litigation*, No. 2023-1093-JTL (Del. Ch.) and *Oklahoma Law Enforcement Retirement System v. Bennett, et al.*, No. 2024-0760 (Del. Ch.) (collectively, the "Delaware Chancery Court Actions"), a confidentiality agreement executed among Plaintiffs and Defendants and related discussions; and (v) publicly filed pleadings in other proceedings, including the Delaware Chancery Court Actions for breach of fiduciary duty brought by shareholders in the Delaware Court of Chancery.

## INTRODUCTION

1. This securities class action seeks compensation for EngageSmart's unaffiliated stockholders for the economic injury caused by Defendants' false statements and concealment of the truth concerning Vista's January 2024 take-private acquisition of EngageSmart at a price of $23 per share (the "Merger" as defined above).

2. To obtain their approval for the Merger, EngageSmart's Unaffiliated Stockholders were falsely assured that the Merger was the result of a fair process, actively overseen by an unconflicted special committee and advised by bankers at Evercore who sought to maximize the value received by those unaffiliated stockholders. In reality, the process was directed by EngageSmart's dominant shareholder, General Atlantic, through advisors at Goldman Sachs & Co. LLC ("Goldman") who worked to ensure that General Atlantic's preferred deal was approved. The deal enabled General Atlantic to receive: (i) a secret non-ratable cash payment of more than $505 million out of funds Vista borrowed to effect the Merger; (ii) a 35% stake in the new company, which Goldman and General Atlantic concluded represented $1.3 billion of incremental value to General Atlantic above the $23 per-share Merger consideration, that would inure to General

Atlantic's benefit over the following five years; and (iii) received, among other things, pro-rata board representation, veto power over major transactions, preemptive rights, and a guaranteed exit after five year.

3. Unaffiliated Stockholders were further falsely assured, through a series of misrepresentations and omissions, including in the Proxy, that the Merger price of $23 per share was the best value they could expect to receive for their EngageSmart stock. In reality, General Atlantic and Goldman effectively sidelined or excluded any competition to Vista. This exclusion was achieved by (i) severely limiting the number of potential buyers who were contacted, (ii) falsely telling those bidders that General Atlantic would only entertain offers that allowed General Atlantic to retain a majority stake in EngageSmart, thus ensuring that those bidders would not offer prices reflecting a "control premium," (iii) refusing to give other bidders time to catch up with the diligence conducted by Vista, and permitted by the Special Committee, prior to the process, (iv) leaking information about the other bids to Vista, (v) ignoring inbound expressions of interest, and (vi) running a sham "go shop" after the Merger agreement was announced.

4. More specifically, and among other things, EngageSmart's stockholders were falsely told, or misled to believe that:

- the Special Committee had rejected a structure that would pay a pre-closing dividend on advice that such a structure "would have adverse consequences for certain stockholders unaffiliated with General Atlantic" when, in reality the pre-closing dividend—which would be paid to all shareholders—was rejected so General Atlantic could receive a secret $505 million dividend post-closing;

- Goldman acted as a financial advisor to EngageSmart, when, in fact Goldman was at all times acting on behalf of General Atlantic with respect to this Merger, had other undisclosed relationships with General Atlantic, and therefore steered the process to General Atlantic's preferred deal with Vista, rather than maximizing the Merger Price paid to Unaffiliated Stockholders;

- the full EngageSmart Board recommended shareholder approval of the Merger because of the "***procedural fairness***"[1] of the process and that the Board believed the deal was "advisable, fair to, and in the best interests of EngageSmart and the Unaffiliated Stockholders" because of "***both the substantive and procedural aspects of the Merger***," despite the systematic favoritism shown to Vista and the exclusion of other bidders, which resulted in a lower price for Unaffiliated Stockholders;

- the Special Committee had "active involvement and oversight" of the process despite the fact that General Atlantic's advisor, Goldman, dominated the process, sidelining the Special Committee and its advisors at Evercore at key moments; and

- another large investor in EngageSmart, Summit Partners ("Summit"), "would not have interests in a potential transaction that differed materially from those of the public stockholders," falsely assuring investors that Summit's interests were aligned with those of the minority stockholders when, in reality, Summit's liquidity needs and close relationship with both General Atlantic and Vista rendered it thoroughly conflicted such that Summit supported a deal that was not in the unaffiliated stockholders' interest.

5. Defendants used these and other falsehoods set forth herein to obtain shareholder approval for the Merger at the undervalued price of $23 per share.

6. General Atlantic (and therefore the board members and bankers working at its behest) was motivated to keep the Merger price low. General Atlantic rolled over its equity on a tax-free basis, which was much more valuable than if General Atlantic had completely cashed out its holdings. For example, General Atlantic only needed to roll over shares representing approximately 26% of the pre-closing equity for 35% of the post-close equity due to the use of debt to partially fund the transaction. And General Atlantic's base case model projected a 19% internal rate of return ("IRR") for its rollover, or an incremental net gain of $1.3 billion over five years. (GA_00012822 at -27). In addition, keeping the Merger price low enabled General Atlantic to arrange for, and receive, a $505 million post-closing dividend out of the debt financing Vista obtained to facilitate the Merger—funds that were not distributed to Unaffiliated Stockholders via

[1] All emphasis herein is added unless otherwise noted.

an increase in Merger consideration. Meanwhile, because the Special Committee failed to advocate for the interests of the minority stockholders, the Unaffiliated Stockholders were cashed out at an inadequate price. Indeed, Vista had internally contemplated paying $27 per share (while still meeting its required returns), and its Investment Committee had already authorized up to $24 per share.

7. Prior to the Merger, General Atlantic owned a majority of EngageSmart's outstanding shares and also possessed a suite of potent contractual control rights, including a right to hand-pick a majority of the members of the EngageSmart Board. For years before the Merger, General Atlantic desired a transaction that would allow it to both liquidate a substantial portion of its investment in EngageSmart *and* retain a significant equity interest in EngageSmart going forward. Even though General Atlantic was open to the idea of selling a majority stake of EngageSmart to the right bidder, General Atlantic refused to allow the Special Committee to solicit offers for anything other than a minority investment in EngageSmart that would cash out public stockholders, provide significant liquidity to General Atlantic, and keep General Atlantic in control.

8. General Atlantic instructed its financial advisor, Goldman, to begin work toward such a transaction. Critically, Goldman understood that its mandate was not to maximize the per-share value at which EngageSmart would be sold. Because General Atlantic wanted to retain an interest going forward and receive a post-closing dividend, General Atlantic was incentivized to keep the price paid to the Unaffiliated Stockholders manageably low. As Goldman recognized in internal email communications subsequently revealed in state court litigation: "*[o]n the primary scenario we are selling equity and rolling at the deal price so we will care about [the price] being higher vs. lower*"; on the other hand, "*[o]f course we are effectively buying out the public at that price with the leverage too so that cuts the other way*." And, as General Atlantic-appointed Board

Defendant Osnoss recognized in a text message to fellow General-Atlantic-appointed Board Defendant Stamas the day before the deal was announced: "shares we [General Atlantic] sell get 23[.] Shares we keep [roll over] get extra cash from dividend that Vista doesn't use to purchase their 65%." (GA_00013117 at -123).

9. In addition to working with and in the interests of General Atlantic on this Merger, Goldman was motivated to please General Atlantic because of its wide-ranging and long-term relationship with the private equity firm, including multiple retentions by General Atlantic portfolio companies totaling over $100 million in the prior two years, outstanding loans worth hundreds of millions more, ongoing other engagements, and massive co-investments in other enterprises. Goldman was also concurrently advising Vista on another transaction and had just provided Vista with a $1.5 billion loan. Furthermore, Goldman's $36 million fee for work ostensibly advising EngageSmart was entirely contingent on a transaction being completed.

10. Goldman realized the fraught nature of this project, acknowledging internally that "*Plaintiffs' litigation is almost a certainty*" and that deal team members should be judicious in considering "*[w]hat should be talked about / written down*." Goldman also recognized it was likely the EngageSmart Board would need to form a Special Committee of putatively independent directors to consider such a transaction and that it would be necessary to take steps to limit the influence of such a Special Committee. To that end, General Atlantic acted to position Goldman to control the Special Committee's sales process from the inside.

11. Defendant Stamas—a General Atlantic executive and the Chairman of the EngageSmart Board—determined that Goldman should represent EngageSmart as its principal financial advisor in connection with exploring a potential sale of the Company. Goldman's own in-house counsel voiced serious apprehensions about Goldman agreeing to serve as EngageSmart's advisor, considering that Goldman was already working as General Atlantic's advisor. But

Goldman went along with the plan, and its role was approved by a two-member Special Committee of the EngageSmart Board that was itself conflicted. The Special Committee subsequently hired its own financial advisor, Evercore, but Goldman exercised all meaningful control over the sales process to the exclusion of Evercore—and, by extension, the Special Committee. Evercore's strategic proposals were consistently overridden by Goldman, Goldman conducted critical conversations with potential bidders outside Evercore's presence, and Evercore was left to consistently complain about being denied meaningful involvement in the process by Goldman. Indeed, even during the final week of the sales process, Evercore was left to complain about *still* being denied access to certain deal folders, being denied access to EngageSmart's virtual data room, and being excluded from key conversations between Goldman and bidders for the Company.

12. Unbeknownst to Investors, the Special Committee and Evercore effectively ceded control over the sales process to Goldman and General Atlantic—despite knowing that General Atlantic's direction to Goldman was for it to maximize General Atlantic's liquidity and IRR on its rollover stake rather than to maximize the price paid to public shareholders. Sidelined, Evercore and the Special Committee allowed Goldman to take steps to ensure that the process resulted in General Atlantic's desired outcome: a control deal with Vista that maximized General Atlantic's IRR and liquidity. The process run by Goldman on behalf of EngageSmart was essentially a charade, as competing bidders appeared to recognize at the conclusion of the process. Specifically, Goldman insisted—over Evercore's objection—that all prospective bidders contacted in connection with the sales process be informed, in no uncertain terms, that only a deal for a minority stake in the Company was possible. All potential market buyers, other than Vista, were led to believe that a deal to acquire a majority stake in EngageSmart was an impossibility; the only deal "on offer" was to purchase a large minority stake in the Company and become a junior partner in a company still controlled by General Atlantic. Meanwhile, General Atlantic and EngageSmart

engaged in conversations with Vista outside the presence of the Special Committee that left Vista with the understanding that General Atlantic *would* support a sale of a controlling interest in the Company. Specifically, Vista's internal notes concerning a July 2023 outreach from General Atlantic reflect Vista's understanding that "*GA is okay being a minority partner.*"

13. This dynamic badly distorted the sales process, considering that a majority position—which would allow a buyer to control the business—would be significantly more valuable and more attractive to many buyers. By telling all bidders other than Vista that only a minority sale was on offer, General Atlantic and Goldman essentially guaranteed that Vista would come out ahead in the process, which is precisely what happened. Other bidders, as directed, submitted bids for a minority position—but those bids were lower than bidders would have offered for a majority position. Francisco Partners, which bid up to $21 for a minority stake in the Company, made this explicit. It told Goldman and Evercore that it "*prefer[ed] to do a majority deal and control the business but that wasn't on offer*." Meanwhile, Goldman further tilted the sales process in Vista's favor by denying other bidders sufficient diligence, while Vista was permitted to "restore" the significantly more comprehensive diligence it had received in connection with its negotiations with EngageSmart in 2022. Francisco Partners expressly stated that it was "[d]isappointed with the level of data sharing" and lacked sufficient diligence to make an improved bid for the Company.

14. General Atlantic, through Goldman, further insisted over Evercore's objection that all prospective bidders be informed that they should not only indicate the Merger price for acquired shares, but also "indicate the amount of funds you assume is used for a distribution of proceeds to the non-selling shareholder [General Atlantic]." (SA-ESMT0009274 at -75; Nov. 13 Hrg. Tr. at 49).

15. Vista, seizing on the advantages afforded to it, and knowing that General Atlantic would steer the process toward a bidder willing to pay a non-ratable benefit, eventually proposed a deal to acquire a majority stake in EngageSmart, with General Atlantic remaining a substantial minority stockholder, for $22.75 per share. Within just three days, and without contacting Francisco Partners or any other bidder to determine what terms they might offer for a majority stake, the Special Committee agreed to a final deal for a majority sale to Vista, albeit at the modestly improved price of $23 per share. Notably, Goldman and General Atlantic perceived that $23 was not the highest price Vista would pay but declined to push for a higher price because a higher price for Unaffiliated Stockholders would have reduced or eliminated General Atlantic's secret post-close dividend.

16. Upon receiving General Atlantic's "ok to [the] price" at $23, the Special Committee—whose members must have known about the secret post-close payment to General Atlantic negotiated by their colleagues on the EngageSmart Board—approved the deal without pushing for a comparable benefit to non-rollover shareholders or otherwise assuring the deal was fair and in the best interests of the non-rollover shareholders in light of that non-ratable benefit paid to General Atlantic. The Special Committee's failure also included failing to determine the maximum that Vista would be willing to pay or whether Francisco Partners or other bidders might be willing to pay more for a majority deal. Upon announcement of the deal, multiple sophisticated bidders expressed their incredulity at how the process had been conducted. Francisco Partners, in particular, reached out to Evercore to complain and express its "[d]isappoint[ment]" and "frustrat[ion]" that the "deal turned into [a] majority" because Goldman "told them multiple times there was no majority deal." The clear indication is that Francisco Partners believed it could have competed with Vista and potentially offered a superior deal if it knew a majority deal was on the table.

17. In subsequent public statements touting the Merger to investors—including in an October 23, 2023 press release announcing the Merger (the "Merger Press Release") and in a December 19, 2023 definitive proxy statement (the "Proxy") soliciting the Unaffiliated Stockholders' votes in favor of the Merger and purporting to inform the Unaffiliated Stockholders concerning their appraisal rights—Defendants acted to conceal all of this and instead painted a picture of a fair and robust process that maximized value for EngageSmart stockholders.

18. Defendants touted, for example, the "*procedural fairness*" of the Merger process, highlighting the purportedly independent Special Committee's "*active oversight of the negotiation process*," that the Merger was "*negotiated by the Special Committee*," and that "*the Special Committee had independent control of the extensive negotiations*." All of this was at least materially misleading. It elided that the process was, in reality, controlled by Goldman, which acted to advance General Atlantic's unique interests at every turn and repeatedly boxed out the Special Committee and its advisors, rather than run a truly fair process. Defendants compounded this disclosure failure by characterizing Goldman as "*exclusive financial advisor to EngageSmart*"—when, in fact, Goldman's loyalties were divided throughout the process—and by failing to disclose numerous additional material facts concerning conflicts of interest that would give stockholders reason to doubt the independence of Goldman, Evercore, and even the Special Committee itself. And Defendants made no mention of the fact that General Atlantic had been promised a $505 million post-closing dividend on the shares it rolled over. Defendants also omitted numerous critical facts concerning the sales process, demonstrating the myriad ways in which these covert side deals and conflicts of interest operated to permit General Atlantic's interests, and its preferred deal with Vista, to prevail over the interests of Unaffiliated Stockholders and superior alternatives that could have been realized if EngageSmart had run a fair process designed to maximize stockholder value.

19. Defendants' myriad material misstatements and omissions of material facts in the Proxy and related filings are detailed extensively herein. Those misstatements denied Plaintiffs their statutory right to evaluate the Merger on an informed basis and caused them to accept Merger consideration that failed to adequately value EngageSmart common stock, for which they could have received higher consideration through a truly fair and impartial sales process. Likewise, Defendants' materially false and misleading statements and omissions of material facts in the Proxy and related filings caused Class Members to sell their stock into the Merger at a price that failed to adequately reflect the true value of EngageSmart common stock, instead of rejecting the Merger consideration at the ballot box or exercising their statutory stockholder appraisal rights.

20. Through this Class Action, Plaintiffs seek to hold Defendants liable for their misrepresentations and to recover damages for the harm stockholders incurred as a result thereof. Plaintiffs assert three counts:

(i) Count I against all Defendants for violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.14a-9) for material misstatements and omissions of material facts in the Proxy;

(ii) Count II against all Defendants for violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder by the SEC (17 C.F.R. § § 240.10b-5) for untrue statements of a material facts and omissions of material facts during the Class Period as set forth herein;

(iii) Count III against Vista, General Atlantic, EngageSmart, McKenzie, Mangum, Osnoss, and Stamas, for Violations of Section 10(b) and Rules 10b-5(a) and 10b-5(c) promulgated thereunder; and

(iv) Count IV against the EngageSmart Defendants and General Atlantic under Section 20(a) of the Exchange Act as control persons for the violations of the Exchange Act.

## PARTIES

### A. Plaintiffs

21. Plaintiff AltShares Event-Driven ETF ("AltShares") is an exchange-traded investment fund formed in 2014 and organized under Delaware law.

22. Plaintiff The Arbitrage Fund is an investment fund formed in 2000 and organized under Delaware law.

23. Plaintiffs AltShares and The Arbitrage Fund are both advised by Water Island Capital, LLC, a New York domiciled SEC registered entity.

24. Plaintiff Hilary L. Shane Revocable Trust is a private trust organized under Florida law.

25. As set forth in the attached certifications, each of the three Plaintiffs held and were beneficial owners of EngageSmart common stock as of the Record Date for the Merger and were entitled to vote on the Merger. Plaintiffs continued to hold EngageSmart common stock through the closing date of the Merger and suffered damages as a result of the Defendants' violations of the federal securities laws alleged herein.

**B. Defendants**

**1. Defendant EngageSmart**

26. EngageSmart, Inc. is a Delaware corporation headquartered in Braintree, Massachusetts. EngageSmart traded on the New York Stock Exchange ("NYSE") under the ticker symbol "ESMT" until the Merger closed, after which it was delisted from the exchange. EngageSmart continues to exist as a subsidiary of an affiliate of Vista. As a result of the Merger, Vista affiliates hold approximately 65% of EngageSmart's equity and General Atlantic affiliates hold approximately 35% of EngageSmart's equity. EngageSmart issued the Proxy and made other false and misleading statements as alleged herein.

**2. The Special Committee Defendants**

27. Matthew G. Hamilton served as a director of EngageSmart from 2018 through the close of the Merger. Defendant Hamilton was a member of the Special Committee from June 27, 2022 to its suspension on October 27, 2022 and again from the date the suspension was revoked

on July 23, 2023 until the close of the Merger. Hamilton was a Managing Director at Summit at all relevant times and was Summit's nominee to the Board. Defendant Hamilton previously served on the board of directors of Invoice-Cloud, EngageSmart's predecessor and a current subsidiary of the Company. As detailed below, the appointment of Hamilton to the Special Committee was highly problematic and caused conflicts of interest: although Hamilton was not employed by General Atlantic, he was employed by Summit, and Summit valued its relationship with General Atlantic over its minority position in EngageSmart.

28. Diego Rodriguez served as a director of EngageSmart from 2022 through the close of the Merger. Defendant Rodriguez was a member of the Special Committee from June 27, 2022 to its suspension on October 27, 2022, and again from the date the suspension was revoked on July 23, 2023 until the close of the Merger. Rodriguez was recommended by Goldman to serve as a director.

29. Defendants Hamilton and Rodriguez—who comprised the Special Committee in the relevant period leading to the Merger and are referred to herein as the "Special Committee Defendants"—opined to Unaffiliated Stockholders that the Merger Agreement was "advisable, fair to, and in the best interests of EngageSmart and the Unaffiliated Stockholders," recommended that the Unaffiliated Stockholders vote in favor of the Merger, and caused that recommendation to be included in the Proxy, despite the undisclosed conflicts and deficiencies in the sales process.

### 3. The Board Defendants

30. Deborah A. Dunnam served as a director of EngageSmart from 2021 through the close of the Merger. Defendant Dunnam was a member of the Special Committee from June 27, 2022 to its suspension on October 27, 2022 but did not serve on the Special Committee after the suspension was revoked on July 23, 2023, purportedly due to the fact she had recently been "introduced to a professional opportunity by General Atlantic."

31. Preston McKenzie served as a director of EngageSmart from 2019 through the close of the Merger. Defendant McKenzie was an Operating Partner at General Atlantic at all relevant times and was a General Atlantic nominee to the Board.

32. David Mangum served as a director of EngageSmart from 2019 through the close of the Merger. Defendant Mangum was a Senior Advisor at General Atlantic at all relevant times and was a General Atlantic nominee to the Board.

33. Raph Osnoss served as a director of EngageSmart from 2019 through the close of the Merger. Defendant Osnoss was a Managing Director at General Atlantic at all relevant times and was a General Atlantic nominee to the Board.

34. Robert P. Bennett is the founder of EngageSmart and served as the Company's Chief Executive Officer ("CEO") and as a director of EngageSmart from the Company's initial public offering in 2019 through the close of the Merger. Defendant Bennett served as CEO of EngageSmart following the Merger until April 2024. Defendant Bennett previously served as CEO of Invoice-Cloud.

35. Paul G. Stamas served as Chairman of the EngageSmart Board from 2019 through the close of the Merger. Defendant Stamas was a Managing Director at General Atlantic at all relevant times and was a General Atlantic nominee to the Board. Stamas signed the Proxy.

36. Defendants Bennett, Dunnam, Mangum, McKenzie, Osnoss, and Stamas, along with Defendants Hamilton and Rodriguez, are collectively referred to herein as the "Board Defendants." The Board Defendants caused the Proxy to be issued and purportedly determined that the Merger Agreement was "advisable, fair to, and in the best interests of EngageSmart and its Stockholders," recommended that the Unaffiliated Stockholders vote in favor of the Merger, and caused that recommendation to be included in the Proxy, despite the undisclosed conflicts and

deficiencies in the sales process, and despite their knowledge that $505 million of the funds secured by the buyer to purchase EngageSmart were secretly diverted to General Atlantic.

**4. The Officer Defendants**

37. Cassandra Hudson has served as EngageSmart's Chief Financial Officer from 2020 to the present. Defendant Hudson signed EngageSmart's Form 8-K filed on October 23, 2023, as well as the December 19, 2023 Schedule 13E-3.

38. Defendants Hudson and CEO Bennett are together referred to herein as the "Officer Defendants." The Officer Defendants signed or caused EngageSmart to file the Forms 8-K, the Schedule13E-3, and/or the Proxy that contained false or misleading statements of material facts or omitted material facts necessary to make the statements therein not false or misleading.

**5. Defendant General Atlantic**

39. General Atlantic, L.P. (along with its subsidiaries and affiliates), a Delaware Limited Partnership, is a global investment firm with $83 billion in assets under management that provides capital and strategic support for 227 current portfolio companies worldwide. Immediately prior to the Merger, General Atlantic owned approximately 52% of the common stock of EngageSmart and was the Company's controlling stockholder.

40. As set forth herein, beginning in 2022, General Atlantic sought a strategic transaction that would monetize and generate liquidity from its five-year investment in EngageSmart but allow General Atlantic to maintain its status as controlling shareholder or, at the very least, to rollover some of its equity interest into the post-transaction Company to maintain some upside exposure.

41. General Atlantic made specific representations in the Proxy concerning General Atlantic's "position" on the fairness of the Merger and the bases for that position and otherwise permitted its name to be used to solicit consent for the Merger from Unaffiliated Stockholders

through the Proxy, that, as set forth herein, contained false or misleading statements of material facts or omitted material facts necessary in order to make the statements in the Proxy materials not false or misleading.

42. General Atlantic also jointly with EngageSmart and Vista filed the Schedule 13E-3 for the Merger that repeated Defendants' prior statements about the sales process for the Merger, including the material misstatements and omissions of material facts concerning the conflicted nature of the Special Committee's and Board's recommendations and the sales process overall.

**6. Defendant Vista**

43. Vista Equity Partners Management, LLC (along with its subsidiaries and affiliates), a Delaware limited liability company, is a global firm with more than $100 billion in assets under management that exclusively invests in enterprise software, data and technology-enabled organizations. In January 2024, Vista and its affiliates acquired approximately 65% of the equity of EngageSmart through the take-private Merger.

44. Vista made specific representations in the Proxy concerning Vista's "position" on the fairness of the Merger and the bases for that position, and otherwise permitted its name to be used to solicit consent for the Merger from Unaffiliated Stockholders through the Proxy, that, as set forth herein, contained false or misleading statements of material facts or omitted material facts necessary in order to make the statements in the Proxy materials not false or misleading.

45. Vista also jointly with EngageSmart and General Atlantic filed the Schedule 13E-3 for the Merger that repeated Defendants' prior statements about the sales process for the Merger, including the material misstatements and omissions of material facts concerning the conflicted nature of the Special Committee's and Board's recommendations and the sales process overall.

### C. Relevant Nonparty

46. Goldman Sachs & Co., LLC, defined above as "Goldman," is an investment banking firm that served as financial advisor, ostensibly to EngageSmart in connection with the Merger and the process leading to the Merger and received a $36 million contingent fee in that capacity. Goldman has a longstanding relationship with General Atlantic and *de facto* acted as General Atlantic's advisor and agent in connection with the Merger and the process. Goldman commandeered the process and repeatedly overruled the Special Committee's advisor Evercore to enable General Atlantic to steer the company to a deal with Vista and to solicit, negotiate and receive the $505 million non-ratable payment to General Atlantic and other favorable post-closing arrangements.

## I. FACTUAL BACKGROUND

### A. General Atlantic's Ownership and Governance Rights Over EngageSmart

47. EngageSmart provides vertically tailored customer engagement software and integrated payments solutions through two segments: (i) its SMB Solutions segment, which provides end-to-end practice management solutions geared toward the health-and-wellness industry; and (ii) its Enterprise Solutions segment, which provides Software-as-a-Service (SaaS) solutions that simplify electronic billing and digital payments. Defendant Bennett founded EngageSmart (which was then known as InvoiceCloud) in 2009. The Company has grown immensely. By 2018, the Company was servicing 25,000 clients; by the time of the Merger, the Company had over 100,000 customers.

48. The Company's growth was spurred by large private equity investments. Defendant General Atlantic and Summit have historically invested in the same projects, as was the case with EngageSmart. In January 2015, Summit made a venture investment in EngageSmart, and in December 2018, General Atlantic followed with a significantly larger investment and

became the majority owner of the Company. For the seven years between 2017 and 2024, General Atlantic infused hundreds of millions in capital into at least seven Summit-backed ventures, showcasing their consistent partnership in co-investing in promising projects.

49. Three years after General Atlantic's investment, on September 27, 2021, EngageSmart completed an initial public offering (the "IPO") of 13.6 million shares of EngageSmart common stock at a price of $26.00 per share, for net proceeds of $326.4 million and a $4.2 billion valuation. Goldman was one of the main underwriters for the IPO. Following the IPO, General Atlantic owned 97.2 million shares consisting of 59.9% of the equity, and Summit owned 26.9 million shares consisting of 16.6% of the equity. At the closing price on the first day of trading, General Atlantic's holdings were worth approximately $3.3 billion.

50. Following the IPO and until the Merger, General Atlantic and Summit enjoyed contractual rights to designate members of the Board and, ultimately, control the Company. Pursuant to a stockholder agreement executed in connection with the IPO (the "Stockholder Agreement"), as long as General Atlantic beneficially owned over 50% of the common stock, it was entitled to nominate five of EngageSmart's eight directors. Moreover, General Atlantic had the right to appoint at least one member to each of the Board's committees. Provided Summit beneficially owned at least 10% of the common stock, it was entitled to nominate one director. At all times from the IPO to the Merger, General Atlantic and Summit owned at least 52% and 15%, respectively, of the Company's common stock.

51. Exercising its contractual rights, General Atlantic filled the Board with four of its employees—Defendants Stamas, Mangum, McKenzie, and Osnoss—and recommended the nomination of a fifth director, Defendant Dunnam. Summit used its seat to appoint Defendant Hamilton, a Summit Managing Director. The final two Board seats were filled by EngageSmart's

CEO, Defendant Bennett, and Defendant Rodriguez who was recommended for service on the Board by Goldman—General Atlantic's longtime financial advisor.

52. In addition to controlling the composition of the Board, General Atlantic was entitled to exercise control over significant transactions. Specifically, under the Stockholder Agreement, EngageSmart was precluded from any "Major Actions"—including a merger—without General Atlantic's express written consent.

53. In order to assure public investors that they would be treated fairly, General Atlantic, Summit, and EngageSmart entered a Stockholder Agreement, which was adopted into the Company's Certificate of Incorporation, and which provided:

> Except as otherwise required by law or expressly provided in this Certificate of Incorporation, each share of Common Stock shall have the same powers, rights and privileges and shall rank equally, share ratably and be identical in all respects as to all matters.

54. Such "Equal Treatment Provisions" are common where public companies are controlled by a majority shareholder, as they serve to entice investment by prohibiting the exercise of majority control to the detriment of minority stockholders.

### B. Following EngageSmart's IPO, General Atlantic Attempts to Liquidate a Portion of Its Investment

55. Around the time of the IPO, General Atlantic began looking for ways to gain liquidity for its roughly $3.3 billion in EngageSmart holdings. Indeed, in January 2021 (*i.e.,* months before the IPO), Vista and General Atlantic—along with various bankers—engaged in multiple conversations about a potential transaction involving EngageSmart and Vista.

56. Vista is a highly successful private equity firm that primarily invests in software and technology companies. Vista has more than $100 billion in assets under management, and, according to public statements by Vista's CEO, Robert Smith, has ***never*** lost money on a buy-out deal. Vista's record is especially notable in the private equity industry, which is known for big hits

and big misses. According to numerous public reports, Vista's exceptional record of success is owed to the firm's secret operating manual. The manual, known as "Vista's Best Practices," reportedly "transform[s] business-software companies into profit machines."[2] According to one longtime Vista investor, Grosvenor Capital Management, "their process is like a factory. A deal comes in and it gets compartmentalized, and they apply experts on each compartment. After it goes off the assembly line, the margins are higher." The *Wall Street Journal* has reported on Vista's expertise in operating acquired companies as follows:

> Members of the firm's 100-person Vista Consulting Group, or VCG, then swoop in. Some set to work revamping the company's contracts and building in automatic price increases and renewals, with the goal of increasing recurring revenue and lowering the risk customers will defect.
>
> Vista also overhauls the sales process, encouraging cross-selling of products, through commissions.[3]

Vista's largest fund has consistently been in the top quartile of comparable funds formed the same year, as measured by annualized returns after fees.[4] Accordingly, partnering alongside Vista tends to be a highly successful strategy for other investors, like General Atlantic.

57. Understanding that General Atlantic did not obtain any liquidity as a result of the EngageSmart IPO, Vista contacted General Atlantic's Managing Director Stamas on March 23, 2022 to invite him to a breakfast. Before the breakfast even occurred, Stamas and EngageSmart CEO Bennett discussed retaining Goldman to analyze, among other things, an avenue to provide "[l]iquidity to shareholders" for EngageSmart. EngageSmart accordingly retained Goldman to

---

[2] Miriam Gottfried and Laura Cooper, "Billionaire's Secret Buyout Formula: 110 Instructions and an Intelligence Test," WALL STREET JOURNAL (Jul. 9, 2018), https://www.wsj.com/articles/billionaires-secret-buyout-formula-110-instructions-and-an-intelligence-test-1531151197

[3] *Id.*

[4] *Id.*

present on potential strategic alternatives at the EngageSmart Board's upcoming May 3, 2022 meeting. There was, notably, already an avenue for public stockholders to achieve liquidity: the New York Stock Exchange. Only large blockholders—General Atlantic and Summit, in particular—would require a strategic transaction to achieve liquidity.

58. After the March 31, 2022 breakfast, Stamas introduced Vista to EngageSmart CEO Bennett and explained that Vista was interested in "start[ing] a dialogue" regarding a potential transaction for the Company. As would become a pattern over the following two years, this led to a series of meetings and discussions between EngageSmart, General Atlantic, and Vista, that were neither known to, nor overseen by, the EngageSmart Board. Indeed, those parties met no less than six times between April 22, 2022 and June 11, 2022—all outside the presence, supervision, and knowledge of EngageSmart's Board members who were not affiliated with General Atlantic. During these discussions, Vista was informed that General Atlantic was open to a whole-company transaction that would take EngageSmart private, and that General Atlantic was looking to roll over about 50% of its equity in any transaction. That is, General Atlantic desired to gain liquidity for approximately half of its stake in EngageSmart.

59. The EngageSmart Board held its regular meeting on May 3, 2022, where it was not informed about the ongoing substantive discussions with Vista. Goldman presented at the meeting and explained that EngageSmart was performing very well, especially as compared to "the Tech IPO Cohort," but that "the Market is Not Rewarding that Performance." Goldman outlined a number of potential strategic alternatives EngageSmart could undertake and informed the Board that Goldman had calculated illustrative present values for EngageSmart's future stock price, forecasting a share price between $29.71 and $41.16 by 2024. Given that EngageSmart's stock closed at $21.40 that day, Goldman's projections contemplated the Company's stock price increasing between 39% and 92% in the following two years.

60. Vista, for its part, was seriously considering a transaction involving EngageSmart. Vista considered EngageSmart "the leading business mgmt. software + integrated payments offering in its respective verticals" and internally contemplated a transaction valuing EngageSmart at $27 per share. Vista was motivated precisely because it recognized a "lack of appreciat[ion] in the public markets" which "create[ed] an attractive opportunity" to acquire EngageSmart from its present stockholders for less than the Company's true value.

**C. EngageSmart Sets Up a Conflicted Special Committee, But Vista Backs Away**

61. With discussions between General Atlantic, Vista, and EngageSmart sufficiently advanced—and with those parties contemplating a transaction that would involve General Atlantic rolling over a significant portion of its equity in the Company, an opportunity not to be afforded to public stockholders—Defendants decided it was time for EngageSmart to form a "Special Committee" that would ostensibly protect the interests of the Company's minority stockholders. On June 27, 2022, the full EngageSmart Board was finally apprised of the "potential transaction" with Vista and determined that a Special Committee independent of General Atlantic was necessary to oversee—or cleanse—the already well-advanced process. The Board appointed non-General Atlantic employees Dunnam, Hamilton, and Rodriguez to serve on the Special Committee.

62. The appointment of Hamilton to the Special Committee was highly problematic: although Hamilton was not employed by General Atlantic, he was employed by Summit, and Summit valued its relationship with General Atlantic over its minority position in EngageSmart. Indeed, Summit had extensive investments with General Atlantic and benefitted from at least *seven* transactions in *seven* years where General Atlantic directly infused capital into Summit or into Summit portfolio companies. Summit, and therefore Hamilton, had an overwhelming interest in pleasing General Atlantic so that Summit could continue to benefit from that relationship for years

to come. Hamilton was even personally involved in Summit's co-investment alongside General Atlantic in a company named Morphe Holdings in 2019.

63. Summit, moreover, shared General Atlantic's interest in liquidating its substantial investment in EngageSmart dating back to before the IPO. Considering the size of its block of shares, meaningful liquidity could not have been easily obtained through open-market sales. A typical private equity investment expects to return cash to investors within 10 years. Summit invested in EngageSmart via funds created in 2008 through 2014. With Summit's funds nearing the end of this lifecycle, Summit was motivated to liquidate, even if it meant leaving some cash on the table, so that Summit could provide a return to its investors. An open-market sale was not an option for Summit because a sale of its large equity position—approximately 15% of the Company—would likely cause a significant decline in EngageSmart's stock price. Indeed, General Atlantic expressly recognized Summit's need to exit its EngageSmart investment and even included a line item labeled "Summit Liquidity" when analyzing potential EngageSmart transactions. In sum, Summit's interests in any potential strategic transaction were more closely aligned with General Atlantic's than with the Company's other minority stockholders.

64. Compounding the conflict created by its alignment and longstanding strategic relationship with General Atlantic, Hamilton and Summit were also conflicted vis-a-vis Vista. Vista and Summit had made at least four large scale co-investments in the same companies between 2014 and 2020, including a 2017 transaction in which Vista acquired a software company from Summit directly and a 2018 transaction in which Vista made a majority investment in a Summit-backed company in a deal valued at over $1 billion. Notably, the Proxy makes no reference to prior dealings between Summit and Vista even though the relationship could reasonably be expected to cause Hamilton to favor Vista over other bidders with which Summit did not enjoy the same longstanding relationship and history of profitable dealings.

65. The Special Committee met on July 1, 2022 and decided to retain Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") as its counsel. Next, despite Hamilton's connection to Summit, the Special Committee discussed "any potential role of General Atlantic and Summit" in a transaction. After hearing an update on the ongoing discussions between Vista, General Atlantic, and EngageSmart, the Special Committee analyzed the need to retain an independent financial advisor. This reflected that the Special Committee fully understood that Goldman was not fit for the job. Indeed, on July 20, 2022, Hamilton emailed colleagues at Summit explaining that Goldman could not represent the Special Committee because it was "conflicted." He explained that the Special Committee was, accordingly, looking at a short list of potential alternative advisors, including Citigroup, Perella Weinberg, and Evercore, who did not share Goldman's "conflict[]" and could therefore handle the assignment. Strikingly, Hamilton made clear that he was not focused on retaining the best financial advisor for the situation, but rather wanted to use the engagement to directly benefit Summit, as he was specifically "*trying to curry favor with some places that tend to show us [Summit] more deal flow*."

66. After entering into a non-disclosure agreement ("NDA") on June 28, 2022, Vista conducted extensive due diligence on EngageSmart. By July 21, 2022, Vista internally concluded that EngageSmart "is a good company and we should buy it." Vista internally modeled a transaction with a $26 per share price and contemplated a structure in which Vista would own 55.6% of the post-merger entity with General Atlantic owning the remaining 44.4%. This internal analysis demonstrates that, based on its extensive interactions with General Atlantic and Goldman, Vista understood that General Atlantic would not demand to retain majority ownership and would instead be open to a transaction resulting in Vista's receipt of a majority position in the Company.

67. Vista, however, backed away after the macro-economy took a sharp turn for the worse in the summer of 2022. Vista concluded that given the "current market environment" it was

"better to stand down on this one for the time being." That said, Vista did not want to close the door entirely; rather, it wanted to "let this down in a way that doesn't damage the relationship or a future opportunity if the world looks different in the next year or so." Vista delivered the news on a July 27, 2022 Zoom meeting with EngageSmart CEO Bennett but stressed that the relationship was not over. EngageSmart got the message. Bennett reported back to General Atlantic and Hamilton that Vista "love[s] the business and the management team," "decided that this is a company that they want to own and a management team that they want to back," and that "they plan[ned] to come back to us in the coming months with a specific proposal on valuation."

68. On October 27, 2022, the EngageSmart Board held a regularly scheduled meeting during which the Board determined that they no longer had any potential strategic matters requiring a Special Committee and, accordingly, suspended the Special Committee.

**D. General Atlantic Continues Its Pursuit of Liquidity**

69. General Atlantic's significant desire for liquidity did not end when Vista walked away from the 2022 discussions. Over the ensuing months, it continued to wrestle with its desire to achieve liquidity for a portion of its investment. In an internal General Atlantic email sent on August 6, 2022, for example, Stamas wrote to colleagues that he was "torn" about General Atlantic selling off some EngageSmart holdings because, on the one hand, it provided "liquidity now," but on the other hand, it would involve "selling at a lower price than we might like."

70. In September 2022, Stamas met with a Goldman representative who later reported to her peers that General Atlantic was "paralyzed" about what to do with EngageSmart and was "itching to begin the [sales] process" but was also "worried about the optics of selling at these levels," and only wanted to run an "abbreviated public process." Then, in October 2022, Stamas told Goldman that General Atlantic is looking to "cash out $500-$1bn." Later that month, on October 26, 2022, Goldman shared an analysis with General Atlantic contemplating a take-private

deal for EngageSmart with a $26 per share sales price and General Atlantic retaining a minority 49% interest in the private company. While Goldman did not move forward with its analysis at that time, the idea that General Atlantic would sell a majority stake in EngageSmart persisted. Notably, the valuation and resulting structure shared by Goldman mirrored Vista's own internal analysis from the prior summer: a deal at $26 per share resulting in General Atlantic retaining a large minority stake rather than majority control over the Company.

71. In the meantime, General Atlantic and Summit generated modest liquidity from their EngageSmart investments when, together with Officer Defendants Bennett and Hudson, they sold eight million EngageSmart common shares in a secondary offering held on March 1, 2023 at a price to the public of $19.00 per share—well below the $26 per share previously floated by Goldman, thereby evidencing both General Atlantic's and Summit's willingness to sell below true value to generate cash. The secondary offering was handled by Citigroup and generated over $126 million for General Atlantic and approximately $35 million for Summit.

72. General Atlantic's desire to monetize its EngageSmart holdings was further evidenced by follow-up emails between General Atlantic and Citigroup. On June 20, 2023, Citigroup told General Atlantic that the market was "focused on GA monetization plans" and Citigroup wanted to "revisit[] potential monetization strategies for GA." Citigroup, for its part, "Continued [to] focus on sizing, structure and execution format" for an "orderly monetization of GA's remaining stake." Internally, General Atlantic was contemplating its options, including the possibility of making "block trades next year to continue monetizing."

**E. General Atlantic and Goldman Restart the Sales Process with an Understanding That Maximizing the Purchase Price Is Not in General Atlantic's Best Interests**

73. In June 2023, without Board knowledge, General Atlantic asked Goldman to restart work towards a sales process designed to monetize General Atlantic's EngageSmart holdings. An

internal Goldman email from June 22, 2023, explained that "GA has confidentially asked us to run take private math for EngageSmart…. GA, who owns just over 50% of the company, plan to roll their stake and look for a partner to buy the rest."

74. Given General Atlantic's dual goals of retaining equity in EngageSmart while also generating liquidity for General Atlantic, Goldman understood that maximizing the purchase price was not beneficial to General Atlantic. As Goldman's internal emails explained: "[o]n the primary scenario we are selling equity and rolling at the deal price so we will care about [the price] being higher vs. lower"; however, on the other hand "*[o]f course we are effectively buying out the public at that price with the leverage too so that cuts the other way*." Thus, as Goldman recognized, General Atlantic was not incentivized to seek the highest price possible for minority stockholders. Instead, General Atlantic was incentivized to realize a price high enough to provide General Atlantic with sufficient liquidity, but low enough to keep the purchase price of minority shareholders manageable from the perspective of General Atlantic and other post-merger stockholders. Accordingly, when Goldman's internal draft materials on July 5, 2023 showed analyses of purchase prices ranging from $20 to $30 dollars per share, Jeff Gido—the Global Head of Goldman's Financial Technology Sector—instructed the team to "*stop at $27*."

75. Notably, throughout its internal conversations concerning the engagement, Goldman repeatedly used the term "we" in reference to General Atlantic, underscoring that Goldman viewed its job as advancing General Atlantic's interests—not EngageSmart's. In fact, multiple deal participants, including Goldman itself, noted Goldman's improper focus on aiding General Atlantic. Goldman's initial draft materials set forth benefits for a potential transaction where General Atlantic would retain a majority interest in EngageSmart by noting that such a structure: "Allows <u>GA</u> to maximize future upside and drive strategic vision" and provides "Potential for <u>GA</u> to monetize some stake." In response, David Freidland, a Goldman Managing

Director, warned that "**In the minority sale rationale can we make those first 2 bullets less about what is good for GA and more about what is good for company and attractive to new investor**[?]" and "**So maybe delete the first one which unintentionally reads like GA getting something that others don't get**." Similarly, lawyers at Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss")—counsel to General Atlantic—also suggested deleting these two bullet points and replacing the deal rationale with something that at least appeared to benefit someone other than General Atlantic: "Near term liquidity for minority shareholders."

76. Moreover, as set forth in Goldman's July 12 presentation to General Atlantic, Goldman knew that, because General Atlantic's interests were not aligned with the minority stockholders, "*Plaintiffs' litigation is almost a certainty*" in connection with any deal along the lines that General Atlantic was contemplating. This was consistent with earlier internal Goldman documents which, strikingly, noted that "[a]ll the books and documents that get made become public" and stressed the need to consider "[w]hat should be talked about / written down."

77. Goldman also recognized that, because General Atlantic was a controlling stockholder, the "Board will form a special committee" and that the "key will be what is the committee mandate, and the litigation protection[s]." Goldman and General Atlantic knew, however, that the Special Committee would not be an obstacle in getting their preferred deal done. In an internal July 12, 2023 email, Goldman explained that a contemplated deadline for "final bids" was really window dressing because "there aren't really final bids." This was because, in Goldman's words, "**We** propose a deal and a price, **we** haggle with the committee, likely bump our price then **we** shake hands and then do the confirmatory diligence on what I would expect is an exclusive basis … Then in the end **we** either do or don't revise or just confirm our proposal based on that"—with "we" referring to General Atlantic. These facts, and many others related to Goldman's allegiance to General Atlantic, were not disclosed in the Proxy.

78. Goldman's ultimate solution to get a deal done that benefitted General Atlantic, as set forth in an internal July 12 email, was to tightly control the entire process from start to finish and limit the Special Committee's role to the greatest extent possible: "the ideal is we present a fully baked deal with price agreed between us and partner to board."

### F. EngageSmart Retains Conflicted Goldman and Reconstitutes the Conflicted Special Committee, Which Retains Conflicted Evercore

79. Ultimately, General Atlantic determined to position Goldman to control EngageSmart's sales process from the inside. Specifically, despite Goldman's ongoing representation of General Atlantic's interests—as evidenced by Goldman's presentation to General Atlantic and Paul Weiss—Stamas, who was a General Atlantic executive and Chairman of EngageSmart's Board, concluded that Goldman could and should somehow ***also*** represent EngageSmart in the deal process. On July 17, 2023, Stamas emailed EngageSmart's general counsel Scott Semel and CEO Bennett to inform them of the decision to hire Goldman.

80. Goldman's own in-house counsel, however, was apprehensive about Goldman representing the Company given the blatant conflict between minority stockholders and General Atlantic. A July 21, 2023 internal Goldman email recounted that Goldman's counsel was "very focused that the special committee with advice from Skadden really agree and be comfortable with the company hiring us to do this. And that the special committee realize (and effectively require us) that they will be in the loop and get to sign off on or veto the things we do." This advice, however, was contrary to Goldman's internal plan to present a "fully baked deal" to the Special Committee and, therefore, was consistently flouted by both the Goldman and General Atlantic team members who worked on the deal. Indeed, the Goldman deal team consistently excluded the Special Committee from key discussions throughout the ensuing process.

81. On July 23, 2023, the Board met and reconstituted the Special Committee but removed Dunnam from participating because she had been recently "introduced to a professional opportunity" by General Atlantic and was no longer independent. Accordingly, the Special Committee now consisted of just Hamilton—who was conflicted based on Summit's unique relationship with General Atlantic and Vista—and Rodriguez. Goldman, who was now purportedly working for EngageSmart, attended the Board meeting ostensibly to discuss an overview and timeline for a sales process. The Special Committee met later that day and approved the plan for Goldman to work on behalf of EngageSmart—despite the obvious conflict—and for Goldman and General Atlantic to start compiling an initial list of private equity firms to contact. Notably, Goldman's engagement letter recognized that the Special Committee did not consider Goldman independent from General Atlantic.

82. The Special Committee acquiesced to Goldman's retention despite the fact that Goldman was seriously conflicted. Goldman's conflicts were pervasive:

i. Internal emails and documents throughout the entirety of the sales process show that Goldman viewed its role as representing General Atlantic's interests;

ii. Goldman had outstanding loans to General Atlantic for $150 million and €300 million, and was therefore interested in General Atlantic obtaining liquidity;

iii. General Atlantic and its portfolio companies had paid Goldman over $100 million in fees in the prior two years, and Goldman would do anything to keep General Atlantic as a happy client;

iv. Goldman was actively advising General Atlantic on two other transactions from which Goldman would receive lucrative fees and had marketed two billion-dollar-plus offerings for General Atlantic affiliates;

v. Goldman's investment divisions and General Atlantic had co-invested in at least six deals and had teamed up in making a $1.7 billion bid for a different company in July 2023, just as Goldman was advising EngageSmart;

vi. Goldman had received $100 million in fees from Vista in the prior two years;

vii. Members of the Goldman deal team advising General Atlantic and EngageSmart were concurrently advising Vista on another transaction;

viii. Goldman had provided Vista with a $1.5 billion loan in July 2023, the very month Goldman began formally representing EngageSmart; and

ix. Goldman had lent Vista and its portfolio companies in excess of $1 billion in 2023.

83. Despite these remarkable conflicts, Goldman was permitted to control key aspects of the process leading to the Merger. Goldman began by drafting a "Proposed Initial Buyer Outreach Script" to be used when courting potential deal bidders. Although the Special Committee was informed by Paul Weiss lawyers that General Atlantic "might be receptive to exploring whole company acquisition proposals" that may "materialize" during the process, General Atlantic was "not willing to <u>solicit</u> whole company acquisition proposals." Thus, Goldman's proposed draft script to potential buyers made clear that "ESMT and/or GA is currently interested in exploring a deal where you [the potential bidder] would acquire ***up to 49% of the business*** and take it private." It did not include any recognition that General Atlantic would, in fact, consider a whole Company bid, or even a majority bid. This was a crucial point. The difference between a sale of "up to 49%" and a sale of more than 50% was a difference in kind, and one that would significantly influence bidder behavior. A majority position—which would allow a buyer to control the business—would be significantly more valuable and more attractive to many buyers.

84. In addition to allowing Goldman to represent EngageSmart, the Special Committee decided that it needed its own advisor as well. Defendant Hamilton—one of the two remaining Special Committee members, despite his own conflicted position—led the process of retaining a financial advisor for the Special Committee. As Hamilton expressed during the 2022 process, he only wanted the Special Committee to retain an advisor that could benefit Summit in later transactions. Hamilton immediately homed in on Evercore, who was simultaneously representing a seller that Defendant Hamilton's colleagues at Summit were pursuing at the time.

85. Aside from being chosen in a blatant ploy to benefit Summit, Evercore was also conflicted by previous relationships with each of General Atlantic, Summit, and Vista. Evercore had received approximately $41 million in fees from General Atlantic over the preceding five years, had earned $36 million in aggregate fees over the past five years from Summit and its affiliates, and received fees of $18.5 million from Vista between January 2020 and October 2023. Each of these relationships provided incentives for Evercore to keep the deal participants' interests in mind over minority shareholders who provided no such benefits to Evercore.

86. Evercore's and Goldman's retention agreements created additional conflicts. The advisors would only receive fees if EngageSmart entered into a strategic transaction, but they would get nothing if EngageSmart remained a standalone company (an outcome that may have benefited Unaffiliated Stockholders). Although never explained in the Proxy, Evercore even requested that its retention include a fee if no transaction occurred—which would have allowed Evercore to advocate that EngageSmart remain an independent standalone company. The Special Committee, however, refused. General Atlantic later acknowledged that the multi-million dollar "success fee[s]" provided to the advisors created a perverse incentive for the advisors to approve any deal on the table. In the end, Goldman received $36 million and Evercore received $24 million from their conflicted representations.

### G. The Special Committee "Approves" the Script and Buyer List that Severely Limited the Potential Bidders

87. On August 6, 2023, Evercore participated in an initial call with Goldman and Skadden to discuss the sales process. Evercore immediately identified problems with Goldman's proposed timing, structure, and plan for the process.

88. First, Evercore recognized there was no need to rush the process: "we/SC have time to step back and analyze strategic alternatives before moving too far down any path." General

Atlantic, however, wanted to move quickly—for reasons inimical to the interests of the Company's minority stockholders. Specifically, General Atlantic was concerned that a positive earnings release by the Company in November would raise the price of the acquisition, which, as noted above, was not in General Atlantic's interests when buying out minority shareholders. In fact, Stamas texted a General Atlantic colleague explaining that the upcoming earnings announcement "increases the desire to 'go.'" Goldman similarly had previously noted that "Paul [Stamas] wants to get moving on this ASAP to see if a deal can be achieved this year," and therefore had calendared the final bid date for October 27, 2023 so a deal was "announce[d] ***before*** earnings."

89. Second, contrary to Goldman's proposed outreach script, Evercore wanted to let potential bidders know that General Atlantic was open to considering a sale of a majority position in EngageSmart. Recognizing the significance of that point and the possibility for the sales process to be distorted if bidders believed that only a minority position was on offer, Evercore suggested edits to the script that would have informed prospective bidders that General Atlantic was "open to all value-creating alternatives" such as a "sale of the WholeCo." This suggestion was rejected by General Atlantic, who, according to an email sent by Skadden, "d[oes] not want the initial outreach by Goldman to solicit interest for or signal openness to a transaction other than the minority partner."

90. The Special Committee met again on August 8, 2023. An Evercore presentation prepared for the meeting noted that EngageSmart was outperforming its peers in revenue growth, gross margin, and adjusted EBITDA margin, but that the Company's stock price was not rewarding that performance. At the meeting, Evercore presented the Special Committee with a list of potential outreach candidates prepared by Goldman. The list included Vista, but not as a "Tier 1" candidate because Vista was expected to pursue a control deal that Evercore believed General Atlantic disfavored; however, two other relevant candidates, Francisco Partners and Hg Capital,

were both in the top Tier. Notably, the list did not include any strategic buyers whatsoever. On August 9, 2023, the Special Committee approved the proposed script—which, despite Evercore's protestations, *did not* include language regarding a "WholeCo Sale"—and authorized Goldman to reach out to the Tier 1 candidates. Thus, the potential bidders contacted by Goldman, including Francisco Partners and Hg Capital, were completely unaware that General Atlantic would contemplate a sale resulting in it no longer holding a majority stake.

### H. Despite Conducting Outreach Exclusively for Minority Investments, General Atlantic and EngageSmart Privately Inform Vista That It Would Consider a Majority Investment

91. At the same time General Atlantic and EngageSmart were reconstituting the Special Committee and preparing to conduct outreach, Vista was underway analyzing a potential deal for EngageSmart that was similar to the one it had contemplated in 2022. Notes from a July 31, 2023 Vista meeting disclose that, although not mentioned in the Proxy, General Atlantic had privately reached out to Vista to re-start deal discussions. According to those internal Vista notes, General Atlantic's Co-President "Anton [Levy]," together with "Robert's counterpart" (a reference to Vista's CEO Robert Smith, whose counterpart at General Atlantic was CEO Bill Ford), "have reached out" as "GA is looking for a way to do a deal with us." The implication from this message was that General Atlantic specifically wanted to team up with Vista, a fact found nowhere in the Proxy. Critically, the notes revealed Vista understood from the call with Levy and Ford that "GA is looking for DPI (distribution to paid-in-capital)" [*i.e.* capital distributions to investors] and that "***<u>culturally, GA is okay being a minority partner</u>***."

92. Thus, while General Atlantic and Goldman continuously stressed to the Special Committee that General Atlantic was only interested in minority investments and refused to even inform outreach candidates that a majority deal was a possibility, General Atlantic tipped off Vista—and only Vista—that it would, in fact, consider a majority sale and that a driving factor for

any deal was General Atlantic's need for liquidity to return capital to General Atlantic investors. Evidently, as part of its plan to control every aspect of the sales process and present a "fully baked deal" to the Special Committee, General Atlantic only wanted its preferred partner to know the true parameters of what a potential transaction could entail.

93. Despite Vista's omission from the preferred outreach list, and given Vista's prior indication that it was interested in purchasing a majority stake in EngageSmart, on August 8, 2023—the same day the Special Committee first met with Evercore—Defendant Bennett contacted Vista to explore Vista's views concerning a potential deal for EngageSmart. While it is not clear whether Bennett was aware that General Atlantic had previously contacted Vista or whether General Atlantic instructed Bennett to make the contact, it is clear that Bennett proactively courted Vista, even though the Special Committee never approved Vista as an outreach candidate.

94. Regardless of whether General Atlantic instructed Bennett to contact Vista, Bennett had his own personal reasons for preferring a Vista deal. Bennett had been CEO of EngageSmart for nearly a decade-and-a-half and was actively looking to retire. A change-in-control transaction would result in Bennett instantly benefiting to the tune of $11 million through unvested incentive awards and other change of control payments not available in a minority sale. Based on the 2022 discussions, Bennett knew Vista was interested in a majority transaction. Thus, both General Atlantic and Bennett favored Vista in a majority deal.

**I. Goldman and General Atlantic Purposely Keep the Special Committee and Evercore in the Dark**

95. Following Bennett's unsanctioned outreach outside the supervision of the Special Committee, Vista reached out to General Atlantic on August 15, 2023 and held a call with General Atlantic on August 21, 2023. Bennett then met with Vista in person on September 5, 2023 and later informed General Atlantic's Stamas concerning the meeting. These communications all

occurred outside the knowledge and supervision of Evercore and the Special Committee. Indeed, the Special Committee was not even informed that Vista had re-entered the process.

96. The exclusion of Evercore, or any representative of the Special Committee, from discussions with potential bidders was part of Goldman's and General Atlantic's scheme to cram through their preferred deal. Indeed, in mid-August, Goldman expressly told Evercore that it was scheduling calls with potential bidders and that "*GS would prefer that Evercore not be part of those presentations* (limiting it to 1 person at GS + management + the bidders)." Accordingly, Goldman would conduct all the conversations with bidders, even though that arrangement would obviously undermine the Special Committee's ability to control the process, went directly against the advice of Goldman's own counsel, and had the obvious potential to distort the sales process because Goldman was exclusively focused on General Atlantic's interests.

97. The Special Committee soon recognized it was getting steamrolled by Goldman, which had seized control of the process and sidelined the Special Committee and its advisors from meaningful involvement in interacting with potential bidders. Accordingly, the Special Committee responded by requiring that any NDA between EngageSmart and potential bidders include a provision requiring that Evercore be included on all communications with EngageSmart but allowed bidders to speak privately with General Atlantic. Accordingly, private communications between bidders and Goldman were <u>only</u> permissible if Goldman were exclusively representing General Atlantic—and not EngageSmart. The fact that Goldman proceeded to have multiple communications with bidders without Evercore present confirms that Goldman was representing General Atlantic to the <u>exclusion</u> of EngageSmart. This was never disclosed.

98. Thereafter, Goldman continued to regularly have non-sanctioned interactions with bidders, while Evercore was forced to repeatedly complain that it was missing substantive communications. For example, Evercore's Senior Managing Director, Nathan Graf, bemoaned in

a private Evercore email chain, "Should we not see the questions and who they came from . . . The [NDA] clearly states no interaction but through advisors so how come GS in receipt of bidder questions without sharing with us." The situation did not get better, as in a later email Graf instructed his team to talk to Goldman on "a more general point on why their default mode is to cut us out like the questions from buyers we still haven't seen."

99. Goldman's internal communications also reflect Evercore's minimal involvement in the process. For example, on August 19, 2023, a Goldman team member texted a colleague noting how Evercore had claimed "we're basically co-advisors" and the Goldman analyst clarified "No we're not." This exchange garnered a laughing response within Goldman. Other Goldman communications called Evercore "useless" and "delusional."

100. EngageSmart management and General Atlantic similarly viewed Evercore and the Special Committee as nuisances. EngageSmart CFO Hudson complained to Goldman about the "bureaucracy" of the Special Committee, that General Atlantic's Stamas continuously "rant[ed] about the SC process," the Special Committee caused "such wasted time," and that meetings with the Special Committee were "[s]o stupid[,] I really hope my next sales process doesn't involve a special committee." Hudson made clear that, in terms of the Special Committee, she was "just doing what I need to at this point" and not keeping them actively involved.

101. Accordingly, when other private equity firms who heard rumors that EngageSmart was open for a sale contacted EngageSmart's CEO Bennett or Goldman on August 18, August 26, August 30, and September 25, 2023, they were not directed to the Special Committee or Evercore.

**J. Evercore Again Pushes to Explore A Majority Sale, But General Atlantic Refuses**

102. The Special Committee was aware that, between August 22, 2023 and September 14, 2023, EngageSmart held management presentations with the Tier 1 bidders. However—despite direct contact between General Atlantic and Vista on July 31, 2023, and between

EngageSmart management and Vista on August 8, 2023—it was not until September 19, 2023 that Evercore or the Special Committee even learned that Vista was back in the mix.

103. In late September, the Special Committee was called upon to authorize a bid process letter outlining the parameters of the potential deal to interested bidders. As with the outreach script, Evercore pushed to inform bidders that a majority transaction would be considered. As Evercore told the Special Committee, "[a] control sale of the Company offers the potential to realize a premium to the current share price while minimizing operational execution risk and transactional complexity." Evercore further emphasized a majority sale offered the "possib[ility] that a buyer would value control sufficiently to support a higher premium than a non-control transaction" and that "[c]ertain financial sponsors prefer to invest in control deals as a structural matter, so the depth of buyer demand may be impacted by the type of transaction" presented. Accordingly, Evercore suggested that EngageSmart ask specific questions to the potential bidders about what drove their valuation and about the "proposed transaction structure." These questions were meant to assess if the bidders would "offer more for control."

104. Emails between Goldman and General Atlantic made clear their respective understanding that Evercore's suggested edits were aimed at getting bids with "a different [transaction] structure" given that the "Committee [was] focused on value maximization"—something General Atlantic and Goldman did not desire. Accordingly, General Atlantic and Goldman *struck the proposed edits* from Evercore. Evercore reported back to the Special Committee that General Atlantic was only interested in "selling a minority stake without a change of control" and the Special Committee therefore approved the bid process letter specifying that only bids for minority positions would be considered. As a result, Vista remained the <u>only</u> potential bidder aware that General Atlantic was "okay with being a minority partner" and might support a sale of a majority interest in EngageSmart.

105. The bid process letters were sent out on September 26, 2023 and provided, in bold print, a bid deadline date of "**October 5, 2023 at 12:00PM ET**." Demonstrating that the entire process was designed to service General Atlantic's interests, the bid process letters also asked prospective bidders to include information about how much debt would be used to fund the transaction, information about how the debt would be used in the transaction structure, and an estimate for how much liquidity General Atlantic would receive based on the proposed transaction.

106. The bid process letters went further, specifically instructing bidders to include "a detailed table of sources and uses of funds which should indicate the amount of funds you assume is used for a distribution of proceeds to the non-selling shareholder" (SA-ESMT0009274 at -75; Hr'g Tr. at 49), i.e. how much cash would be paid just to General Atlantic in relation to the shares they were *not* selling. Thus, Goldman indicated to prospective bidders that General Atlantic sought a non-ratable payment in the form of post-closing dividend. Evercore recognized that instructing bidders to indicate how much they would pay to General Atlantic in a post-closing dividend was likely to cause bidders to set aside funds for the secret payment and therefore pay less for the shares being sold in the Merger. Evercore therefore objected to the inclusion of such an instruction in the bid process letter that went out to prospective bidders. Yet, contrary to the Proxy's narrative that Evercore controlled the outreach under the supervision of the Special Committee, Goldman unilaterally overruled Evercore and included the instruction over Evercore's objection.

107. The bid process letter also failed to advise prospective bidders that Evercore was advising the Special Committee, instead collectively referring to Goldman and Evercore as "the Advisors" and directing proposals be sent to both simultaneously. (SA-ESMT0009274). Nor did the bid letter instruct bidders to include Evercore in communications about bids or potential bids. Rather, it listed the Goldman team members and their contact information first. (*Id.* at -74). Indeed, it instructed bidders to contact only Goldman to obtain approvals to seek financing

commitments and diligence items from third parties, essentially inviting bidders to exclude Evercore from initial conversations. (*Id*. at -75). Further setting up an end-run around the Special Committee and Evercore, and indicating to bidders that side negotiations with General Atlantic were expected, the bid process letter invited prospective bidders to contact General Atlantic directly, stating "General Atlantic will also be available to answer questions related to the Transaction." (*Id*. at -74).

**K. Bid Day Comes and Vista Gets More Inside Information**

108. Leading up to the bid deadline, Goldman and Evercore entertained numerous calls with potential bidders. After speaking with Goldman on October 4, 2023, Evercore summarized internally that "we'll get something between 3 to 5 bids," and that "Vista [was] now saying they may come in Monday"—*i.e.*, October 9, 2023. Apparently, Goldman was agreeable to Vista openly disregarding the bid process letter's boldfaced, precise-to-the-minute deadline.

109. On October 5, 2023, bid day, *Reuters* published an article reporting that General Atlantic was exploring a sale of EngageSmart, that several private equity firms were participating in the process, that the first-round of bidding was underway, and that initial offers were due later that day. As a result of this news, analysts began predicting a fair purchase price for EngageSmart: Raymond James analysts stated they "believe ESMT is worth between $25–28 per share in a takeout scenario"; Truist maintained a price target of $30 per share; and Baptista issued a report with a price target of $25.70 per share.

110. The public disclosure that EngageSmart was up for sale also revealed that the deal process to date had been unduly restricted. Indeed, following the public disclosure, no fewer than *eight* private equity firms that had not previously been contacted reached out to express interest in a potential deal. Naively thinking that General Atlantic and Goldman were interested in maximizing deal value, Evercore expressed internally that "inbounds may force the conversation

on expanding list and potentially scope." But given General Atlantic's and Goldman's desire for only their preferred "fully baked" deal, they did not let that happen, and prospective bidders that showed inbound interest were never permitted into the process or invited to present bids.

111. EngageSmart received four bids on bid day. Pursuant to the bid process letter, three initial bids, including bids made by Francisco Partners and Hg Capital, came in for 49% of the Company, and ranged from $17 to $21 per share. The final bid offered $20–$22 per share but was limited to only a $300 million maximum, or just 9% of the outstanding shares.

112. General Atlantic was not happy with the submitted bids. Francisco Partner's bid noted that the deal's financing would not provide General Atlantic with any liquidity (as a non-ratable payment or otherwise). General Atlantic Managing Director and EngageSmart Board member Raph Osnoss called that "BS." Osnoss also noted that Hg Capital's offer was "a bummer" because of its "low assumption" for debt—which translated to less liquidity for General Atlantic.

113. On October 7, 2023, after bid day and before making its belated bid, Vista contacted Goldman without anyone from Evercore or the Special Committee on the line—meaning Goldman was only representing General Atlantic on this call. During this call, Goldman directly informed Vista that its bid needed to be above $22 to clear the first round. Thus, rather than penalize Vista for missing the bid deadline, Goldman provided General Atlantic's preferred bidder—Vista—with preferential treatment and provided information unavailable to other bidders, allowing Vista to make the minimum possible offer to be invited to the next round.

114. On October 9, 2023, consistent with the tip it had received from Goldman, Vista submitted a bid for an acquisition of 49% of EngageSmart common stock for between $22.00 and $23.00. The proposal indicated Vista could complete diligence within seven days after receiving requested information and expected to execute a definitive agreement within 8-10 business days.

### L. Francisco Partners "Prefers" A Majority Deal and Complains About the Lack of Diligence

115. With the bids in hand, Goldman and Evercore conducted "Bid Walkthough[s]" with the bidders. Not mentioned anywhere in the Proxy is that, during an October 9, 2023 discussion, Francisco Partners expressly told Goldman and Evercore that it "***prefer[ed] to do a majority deal and control the business but that wasn't on offer***." The Proxy elided this by disclosing that Francisco simply stated that it had "expressed that its typical transaction would have involved a change of control," while *not* disclosing that Francisco Partners had expressly stated it had a "preference" for a majority transaction with EngageSmart. In truth, Francisco Partners' statements to Evercore and Goldman that it ***preferred*** a majority deal, but that its preference was not "on offer," indicates that its bid of $20.50 to $21.00 per share was priced based on the lack of control and that, were a majority sale a possibility, Francisco Partners would have been willing to pay a higher price for the shares of EngageSmart stock held by minority stockholders.

116. Moreover, and again completely absent from the Proxy, Francisco Partners told the advisors that it did not have all the data it needed to make an improved bid. Specifically, according to Evercore's notes from the bid walkthrough, Francisco Partners was "***[d]isappointed with the level of data sharing so far.***" Vista, meanwhile, was not plagued by the same informational disadvantage. This was because the Special Committee expressly allowed Vista to "restore" its files from the 2022 process which provided more comprehensive data. As Vista made clear in internal talking points, the 2022 process provided "quite frankly, more access to information than we received in this process." Vista was, therefore, further privileged among the potential bidders. Despite its informational disadvantage, Francisco Partners assured Evercore that "[w]ith full access they can go super fast" and "[c]an run at it in a couple of weeks." Thus, unbeknownst to

shareholders, Francisco Partners, like Vista, wanted to make a majority offer and was willing to move fast to make that happen.

**M. Vista Follows Its Well-Known and Anticipated High-Pressure Acquisition Strategy**

117. During its October 10, 2023 meeting, the Special Committee limited the bidder list to three potential acquirers by inviting Vista, Francisco Partners, and Hg Capital to a second round of bidding. The Special Committee decided not to allow multiple bidders who reached out in the aftermath of the October 5, 2023 *Reuters* article to enter the process, specifically because, among other things, "General Atlantic was not willing at such time to solicit interest in a transaction other than selling a minority stake without a change of control." Again, only Vista had been informed concerning the true parameters of a potential deal.

118. The Special Committee told Vista, Francisco Partners, and Hg Capital that second round proposals were due in four weeks, but when Vista expressed the desire to move quickly on the timeline indicated in its proposal, Evercore and Goldman told Vista that they would work with them to move faster than with other bidders. Again, Vista was given an unfair advantage.

119. Vista's desire for speed was not surprising as Vista is well known for using a high-speed, high-pressure acquisition strategy.[5] "Vista leverages its ability to move quickly from an expression of interest, through confirmatory diligence, to a firm offer, thereby truncating the process and reducing interloper risk. Vista calls it 'sprinting,' and for Vista, that's good business."[6] Although speed suits Vista's needs, it often presents problems for target companies and their minority stockholders. "For a target company seeking to maximize stockholder value, however, a

[5] *See In re Mindbody, Inc., Stockholder Litigation*, C.A. No. 2019-0442-KSJM, 2023 WL 2518149, at *14 (Del. Ch. Mar. 15, 2023) ("Vista is a pro at acquiring companies . . . Vista's advantage is speed.").

[6] *Id.*, at *1.

truncated timeline can present challenges. It takes time to develop alternatives to promote competition and extract the best price. By sprinting to the finish line, Vista seeks to prevent a target company from doing that."[7] In this case, General Atlantic, EngageSmart, and the Special Committee gave Vista an inside track and tilted the playing field in the sales process, allowing Vista to use its *modus operandi* of speed to a tee.

120. Knowing Vista's reputation, Evercore had previously discussed on September 27, 2023 that they "need[ed] to start thinking about what we do if Vista tries the playbook they often do," and a second Evercore representative responded in agreement, acknowledging Vista "know[s] the business cold . . . so it is a good assumption that they will follow their playbook." A third Evercore representative noted, "It has been a successful playbook for them. And it's also been successful for our clients [], if we are ready to adjust fire when they try to expedite things."

121. Nonetheless, neither Evercore nor the Special Committee did anything to "adjust fire," despite anticipating Vista's attempt to jump the process. Instead, both Evercore and the Special Committee let General Atlantic and Goldman control the process without setting conditions that would allow multiple bidders to fully analyze a deal. Thus, the Special Committee told Vista that if it wanted to move fast, it was on board—playing right into Vista's playbook.

### N. Evercore Is Excluded From Communications While Vista Capitalizes On Its Inside Information and Makes A Majority Deal Proposal

122. On October 17, 2023, the Special Committee held a meeting, also attended by Semel, Evercore, and Skadden. According to the Proxy, Evercore updated the Special Committee on interactions with prospective investors interested in a potential transaction involving EngageSmart; that Vista continued to progress its due diligence at the accelerated pace reflected in its proposal; that Francisco Partners had requested a dinner meeting with senior management

[7] *Id.*

for the week of October 23, 2023 (to be attended by a representative of Evercore); and that Hg Capital appeared to be less engaged. Evercore discussed with members of the Special Committee the considerations around setting a final bid deadline in the range of November 9 to November 14, 2023. Evercore warned that, with an earlier deadline, the other bidders "might not have sufficient time to complete their review." Thus, a short turn-around was only helpful to Vista, who had prior access to information from 2022.

123. Also at the October 17, 2023 Special Committee meeting, the Special Committee discussed whether EngageSmart would distribute a dividend in connection with the Merger. The Proxy ultimately reported only that a pre-closing dividend (which would have been shared with the public stockholders) was discussed and rejected, but said nothing about the $505 million post-closing dividend Vista offered and ultimately paid exclusively to General Atlantic.

124. Email correspondence from October 18, 2023 shows that Evercore was consistently kept out of key deal discussions during this critical time. For example, Goldman had excluded Evercore "from certain folders" and had not provided Evercore access to the virtual data room. Despite prior requests, Goldman had not provided the proper access and otherwise failed to keep Evercore updated on discussions with bidders. Evercore's Graf was angry: "***We don't need to ask multiple times. Simply tell them on behalf of the special committee we needed analytics permissions. And also tell (don't ask) them to cc you on the drl emails going back and forth between gs and bidders***." Understanding that Evercore was being excluded from key deal communications that were happening at breakneck speed, Graf sent another email suggesting that Evercore "put a standing daily call on calendar w gs working team to run through diligence / meeting request updates." Another Evercore deal team member, Adi Jayaraman, similarly asked his colleague whether he had "push[ed]" Goldman's Arif Sikora "about his teams lack of responsiveness and keeping us abreast of developments."

125. Yet, even after Evercore's direct protestations, Goldman continued to prevent Evercore from having meaningful influence over the sales process. The very next day, October 19, 2023, the Special Committee's counsel at Skadden learned that Vista planned a follow up call with Goldman. Skadden explained to the Special Committee that it "told [General Atlantic's] advisors [*i.e.*, Goldman] that the Special Committee hasn't been consulted on this, and so there would need to be an Evercore participant on that call." Evercore wanted to speak with Goldman in advance of the Vista call, but Goldman ignored Evercore's request until 15 minutes prior to the call.

126. On Friday, October 20, 2023, Vista met with its internal Investment Committee and, using inside information unknown to other bidders (*i.e.*, that General Atlantic was open to a deal that would result in General Atlantic retaining only a minority position), decided it would make a majority bid for EngageSmart. Ultimately, the Investment Committee authorized Vista to acquire 70% ownership of EngageSmart for a price up to $24 a share.

127. Later that day—well before the bid deadline provided to Francisco Partners and Hg Capital—Vista submitted its revised majority proposal. Vista's bid proposed $22.75 per share in cash, with General Atlantic rolling over a portion of its existing shares representing 40% of the post-closing equity of EngageSmart, with Vista obtaining a majority stake and therefore control. Yet the Merger price fell within the range Vista previously submitted of $22–$23 per share, effectively offering ***no additional value for control***.

128. Unknown to the public stockholders, Vista also offered General Atlantic significant and highly valuable governance rights. In addition to pro-rata board membership, under Vista's proposal, General Atlantic would be entitled to veto major actions going forward and maintain its post-closing equity position in future offerings through pre-emptive rights and a right of first refusal. Defendants did not disclose that Vista provided these additional benefits to General

Atlantic, concealing additional value that Vista was willing to give to General Atlantic (but not the Unaffiliated Stockholders).

129. Also not disclosed to the public, Vista separately communicated to General Atlantic and the other Defendants that General Atlantic would be paid $505 million as a post-closing dividend, a fact not disclosed in the Proxy or memorialized in the Merger Agreement filed as an exhibit to the Proxy and to the October 23, 2023 Form 8-K. Vista also indicated it had "completed all of our due diligence and stand ready to finalize definitive agreements upon acceptance of our proposal" and threatened, in bold, underlined print:

> **We are providing this Proposal with the expectation that the Company will quickly engage with us to reach agreement on a very expedited timeline. If you are not willing to proceed with us on an expedited timeline, we will be forced to reevaluate our participation in this process.**

Vista offered no explanation for the rush, and General Atlantic and the Special Committee could only have understood it for what it was: an admission that Vista knew it was unlikely to secure the deal at the offered price if other bidders were permitted to make their best offer after conducting due diligence.

130. Vista also held a call with representatives of General Atlantic, Evercore, and Goldman and explained that Vista desired to sign and announce a transaction on Monday, October 23, 2023, the very next business day.

### O. Vista's Bid is Accepted in Just Three Days Despite the Fact That Other Bidders Were Not Given the Chance to Compete for a Majority Position

131. In immediate response to the new offer, Goldman held a meeting on October 20, 2023 with General Atlantic and Paul Weiss—but not Evercore, the Special Committee, or Skadden. Moreover, Stamas instructed his General Atlantic team to "run a version" of the internal analysis "where it shows exactly what liquidity we get and how much we own," demonstrating that General

Atlantic's focus remained on its own liquidity rather than maximizing the deal valuation. This meeting is not disclosed in the Proxy.

132. Later that day, the Special Committee held a meeting, also attended by Semel, Evercore, and Skadden, where Goldman relayed that General Atlantic had provided initial feedback on the October 20 proposal and that General Atlantic was potentially willing to pursue a transaction involving a sale of control as proposed by Vista. Part of the rationale, as explained in the Proxy, was the "level of interest" parties had in buying a minority share. The Proxy, however, did not indicate that Francisco Partners had previously expressed a preference for a majority deal but was rebuffed by Goldman.

133. Following discussion, the Special Committee directed Evercore to make a counterproposal to Vista consisting of $24.00 per share in cash and changes to Vista's proposed merger agreement to include, among other things, a 45-day go-shop provision. General Atlantic supported the counterproposal.

134. The Special Committee, however, did not go back to other bidders and shop the control deal that was now being offered. Thus, as to the majority deal then being contemplated and ultimately agreed upon, EngageSmart's sales process was effectively a single-bidder process. Though the Special Committee had gone through the motions of soliciting bids, those bids had been for a fundamentally different transaction than the majority deal proposed by Vista. Indeed, other bidders had been expressly informed that a majority deal was unavailable. When the contours of the deal changed, neither the Special Committee nor anyone else attempted to reengage with the other bidders to gauge their interest in a majority transaction—including Francisco Partners, which had expressly stated its interest in such a deal. Indeed, while discussions with Vista moved forward at breakneck speed, Goldman actively *delayed* discussions with other bidders. For example, on the same day Vista submitted the October 20 proposal and insisted upon

a deadline to announce a transaction by Monday, October 23, 2023, a different bidder, Hg Capital, asked for an update on the timeline, and Goldman and Evercore responded that they would hear something by the middle of the following week—*i.e.*, after Vista's Monday deadline.

135. On the morning of October 21, 2023, Vista responded to the Special Committee's counterproposal with a revised non-binding proposal consisting of increased consideration of $23.00 per share in cash and rejecting the proposed go-shop provision.

136. Later that morning, Goldman communicated to Evercore that General Atlantic wanted to make a revised counteroffer at $23.50 per share. That afternoon, the Special Committee held a meeting, also attended by Semel, Evercore, and Skadden, and directed representatives of Evercore to convey a counterproposal consisting of $23.50 per share with a 30-day go-shop. Evercore communicated the revised proposal that day.

137. The next day, October 22, 2023, Vista declined to increase its price to $23.50 but indicated that it would accept the proposed 30-day go-shop provision. According to the Proxy, Vista communicated to Evercore and Goldman that a deal at $23.00 per share was the highest price per share that Vista was willing to pay—however, it is clear that General Atlantic and Goldman did not consider the $23 bid to be Vista's true "final" offer, as they contemplated making an additional counterproposal.

138. Ultimately, however, General Atlantic was not incentivized to seek a further price increase because it would diminish General Atlantic's liquidity. Indeed, Stamas was unsure of whether General Atlantic should counter again at $23.50 per share and asked his colleagues whether General Atlantic should take the deal or push for a price increase. General Atlantic's Osnoss and Stamas expressly discussed how the proposed increase in Merger consideration would lead to $70 million less liquidity for General Atlantic (as a higher Merger price would leave less money for a post-closing dividend, and more rollover equity would be required to maintain the

desired equity ownership level). Accordingly, Osnoss concluded that Vista had "the leverage and they know it," and "[i]t's a good price." Thus, by General Atlantic's own admission, Vista's knowledge that General Atlantic needed liquidity and that an increase in purchase price meant less cash for General Atlantic directly affected deal negotiations.

139. Defendants Osnoss and Stamas plainly understood that General Atlantic benefitted from a lower Merger Price and Vista was offering them a non-ratable payment in exchange for favoring Vista in the process and agreeing to a low Merger price for the selling shareholders. As Osnoss put it in a text message to Stamas on October 22, 2023, "Oh yea[,] they're [Vista] using [cash from debt] to buy their [65%] share and send out extra to us [General Atlantic]." (GA_00013117 at -123). Osnoss then approvingly summarized, "Shares we sell get 23[.] Shares we keep [roll over] get extra cash from dividend that Vista doesn't use to purchase their 65%." (*Id.*)

140. General Atlantic also recognized that Goldman would be in favor of this deal and would not push for another counterproposal, specifically because Goldman was not concerned with maximizing value for minority stockholders but, instead, with securing its own success fee. According to General Atlantic's Stamas, Goldman was all about "Deal deal deal deal. Money money. Totally objective 😊"—referring to Goldman's $36 million transaction fee if a deal was consummated. That Goldman's and General Atlantic's interests conflicted with other EngageSmart shareholders had a real impact on the ultimate transaction because internal Vista documents reflect that Vista's board had authorized an offer of up to $24 per share, that Vista had internally determined it could pay as much as $27 a share and still meet its target internal rate of return, and that Vista had sufficient financing in place to make the secret, non-ratable payment of approximately $505 million to General Atlantic—which if distributed to all shareholders would

have meant an approximately $3.00 per share increase above what the public shareholders actually received.

141. Bennett also did not believe that Vista's offer was "final." Bennett thought there was additional value being left on the table and indicated that he "will take the recommendation of [the Special Committee]" but thought it might make sense "to try once more on price." General Atlantic's internal discussions showed that Osnoss thought it was "dumb to fight over 25c."

142. The Special Committee met on October 22, 2023, to decide whether to accept the offer. However, according to an email from General Atlantic's General Counsel, the Special Committee was not ready to make the final decision because "they want[ed] [General Atlantic's] blessing first" and were "waiting for [General Atlantic] to say ok to price." That is, the Special Committee deferred to what General Atlantic wanted. Only after hearing that General Atlantic was in agreement as to the deal terms, the Special Committee accepted the offer.

143. On October 23, 2023, EngageSmart announced the Merger in the Merger Press Release. As detailed below, the Merger Press Release was materially false and misleading concerning the events leading to the Merger. *infra* ¶¶ 152-160.

144. Upon the sudden announcement of the Merger, the other bidders reacted with shock to the fact that EngageSmart and General Atlantic had agreed to a majority deal with Vista, without ever indicating to the other bidders such a deal was possible. Indeed, although not disclosed in the Proxy, Francisco Partners proactively "reached out to" Evercore and "complained" about the structure of the newly announced deal and the fact that Francisco Partners had been misled throughout the process. Francisco Partners told Evercore that it was "[d]isappointed" and "frustrated" that the "deal turned into [a] majority" because Goldman "told them multiple times there was no majority deal." Francisco Partners also noted that it had not been contacted by

Goldman since the Merger was announced, implying that no one checked whether Francisco Partners would make a stronger control offer.

145. Furthermore, unbeknownst to the public, Francisco Partners raised doubts about whether EngageSmart and General Atlantic ever seriously considered "a real minority deal." Francisco Partners remarked that, had such a deal been contemplated, they "[w]ould have thought Vista not in process." This concern was well-founded, as Vista's hallmark lies in implementing sweeping operational transformations—an approach that necessitates gaining full operational control over its investments. Consequently, without even knowing that General Atlantic had tipped off Vista as to the true parameters of a potential deal at the very outset of the process, Francisco Partners recognized that Vista's involvement in the deal process strongly suggested that the minority offering to other bidders was nothing more than a façade. Ultimately, Francisco Partners expressed that it "[w]ished they were told" that a majority deal was possible, "but understood the [V]ista playbook." Similarly, Hg Capital called Goldman and "wanted to know how this ended up majority. Feels like [EngageSmart] tapped out."

**P. After the Go-Shop Fails, Defendants File a Materially Misleading Proxy Statement, and the Merger Is Approved**

146. The Merger Agreement provided for a 30-day go-shop period. If the Merger Agreement were terminated during the go-shop period, EngageSmart would be required to pay Vista a termination fee of $72.185 million (representing 1.8% of the equity value). This fee would increase to $144.37 million (representing approximately 3.6% of equity value) if the Merger Agreement were terminated after the go-shop period ended.

147. The bidders knew the go-shop was illusory. *First,* throughout the entire process, bidders were told General Atlantic would not approve anything but the sale of a minority stake, only to accept a majority deal from Vista. As a result, bidders like Francisco Partners understood

that General Atlantic only wanted a deal with Vista—its preferred bidder. *Second,* after General Atlantic made itself and EngageSmart CEO Bennett available for any due diligence questions from Vista, the go-shop precluded bidders from talking to General Atlantic or Summit until *after* making a superior proposal. Thus, other bidders understood that they would first need to top Vista's bid to the selling shareholders and *then* persuade General Atlantic to forgo any undisclosed side payment—which the other bidders knew had been solicited in the confidential bid process letter. *Third,* Goldman and Evercore encouraged Francisco Partners and Hg Capital to drop out of the go-shop process quickly. Indeed, Goldman and Evercore agreed that they needed to "bottom out HG and [Francisco Partners] quickly" and believed that they were successful in that effort. Evercore and Goldman called "[Francisco Partners] and HG and delivered [a] message (with skaddens guidance…[)]" that sufficiently bottomed out Hg and [Francisco Partners]. Evercore reported that Francisco Partners was "Very disappointed . . . Wasted a lot of time . . . [and was] mostly likely a no." Hg stated it was "[u]nlikely they come back." Goldman acknowledged "it [is] rare that a go-shop would ultimately increase the consideration received by [a] Company's stockholders and that it [is] also rare to see another private equity bidder submit a topping bid in a transaction already involving a private equity buyer." As expected, and by design, the go-shop failed.

148. On December 19, 2023, Defendants issued the Proxy to "inform" stockholders concerning the Merger and solicit their votes in favor thereof. The votes of the Unaffiliated Stockholders were important because the Merger was conditioned on approval by the Unaffiliated Stockholders. As detailed below, however, the Proxy issued to solicit the votes of the Unaffiliated Stockholders was materially false and misleading concerning the events leading to the Merger. *infra* ¶¶ 162-199.

149. The shareholder vote occurred on January 23, 2024, and the Merger was approved. Three days later, on January 26, 2024, the Merger closed. The Unaffiliated Stockholders received $23 per share as Merger consideration and the Company's common stock was delisted.

150. Following the closing, in light of the ongoing close relationship between the firms, Vista presumably made good on the secret side deal, and General Atlantic received the promised payment of approximately $505 million.

## II. DEFENDANTS' VIOLATIONS OF THE EXCHANGE ACT

151. Throughout the Class Period, Defendants issued or caused to be issued SEC filings that contained numerous false or misleading statements or omitted material facts concerning: (i) the unfair sales process that provided distinct advantages to Vista, including its exclusive knowledge concerning General Atlantic's willingness to become a minority investor following a strategic transaction; (ii) the fact that other bidders indicated a desire to make a majority bid during the sales process but were rebuffed, and later questioned whether a minority deal was ever a real possibility; (iii) General Atlantic's true motivations for liquidity, internal rate of return and a non-ratable side payment and that a higher purchase price would be inconsistent with these motivations; (iv) the extent of the overall conflicts that infected essentially every aspect of the sales process; and (v) ultimately, as a result of all of the foregoing, the unfairness of the Merger to the Unaffiliated Stockholders. These disclosures contained materially false and misleading statements and omissions, thereby denying stockholders an appropriately informed vote on the Merger and an appropriately informed opportunity to decide whether to accept the Merger consideration or instead exercise their appraisal rights.

### A. False or Misleading Statements or Omissions of Material Facts in the October 2023 Merger Press Release

152. On October 23, 2023, EngageSmart and Vista issued the joint Merger Press

Release, entitled *EngageSmart Agrees to Be Acquired by Vista Equity Partners for $4.0 Billion*, which EngageSmart filed with the SEC as a "Current Report" on Form 8-K signed by Defendant Hudson, which was identified as "Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)," and which was incorporated by reference into the Proxy. The Merger Press Release stated:

> A special committee of EngageSmart's Board of Directors comprised of ***independent directors*** [] ***advised by independent legal and financial advisors***, was formed to conduct ***a deliberate and thoughtful process*** to evaluate this proposal and other potential value creation opportunities for EngageSmart.

153. This statement was false and misleading and omitted material facts. The Merger was not the result of a "deliberate and thoughtful process" because Vista was the favored bidder throughout and was privy to a different process entirely. Indeed, as early as July 2023, General Atlantic reached out to Vista—outside the Special Committee process—and communicated that General Atlantic was "looking for a way to do a deal with" Vista and that General Atlantic was "okay being a minority partner"—facts not disclosed to other bidders or investors.

154. Thus, while every other bidder was consistently told that General Atlantic was only interested in selling a minority stake without a change of control, Vista knew that General Atlantic was open to selling a majority stake in EngageSmart and used that information to its unique advantage. The Special Committee knew that other parties were interested in bidding for a controlling stake in the Company, with Francisco Partners in particular: (i) telling Goldman and Evercore in October 2023 that it ***"prefer[ed] to do a majority deal and control the business but that wasn't on offer***"; (ii) complaining after the announcement of the Merger that they "wishe[ed] they were told" that a majority deal was possible, indicating they would have made a competing bid; and (iii) even questioning whether EngageSmart and General Atlantic ever seriously considered "a real minority deal" from the start. Moreover, the process was not "thoughtful" or

"deliberate" because Vista had an informational advantage throughout. The Special Committee gave Vista (and only Vista) access to the more comprehensive due diligence from the 2022 sales process. This provided Vista "quite frankly, more access to information than we received in this [2023] process" while other bidders were "[d]isappointed with the level of data sharing." The disparate due diligence provided to bidders was never disclosed to shareholders.

155. Moreover, the Merger negotiations were dominated by Goldman. Evercore and the Special Committee knew that Goldman had boxed them out of much of the Merger negotiation process but ultimately acquiesced to Goldman and covered up these facts in the Proxy. This was highly problematic, as Goldman was simultaneously advising General Atlantic, whose interests diverged from the Unaffiliated Stockholders. Indeed, the Proxy hid that Evercore repeatedly tried to open the process to control bids to prospective buyers, but was overruled and thwarted by Goldman. Goldman also had numerous undisclosed engagements with General Atlantic, Vista, and Summit. Any notion that the sales process had been facilitated by "independent" financial advisors was simply false.

156. Additionally, the statement in the Merger Press Release that the Special Committee was comprised of "***independent directors***" was false and misleading and omitted material facts. Defendant Hamilton—one of the two members of the Special Committee—was a Managing Director of Summit, which, like General Atlantic, was motivated to monetize its investment in EngageSmart to obtain liquidity, as the Summit funds that invested in EngageSmart were past or nearing their typical 10-year life cycle in 2023. Hamilton, as a Summit Managing Director, was incentivized to achieve a transaction that allowed Summit to liquidate its EngageSmart holdings and return capital to investors, even if the transaction was not in the best interests of EngageSmart's public stockholders. General Atlantic recognized that Summit was aligned with its liquidity goals, as General Atlantic deal analysis materials included a line item for "Summit Liquidity."

Additionally, Summit frequently co-invested with General Atlantic, including no less than *seven* times over the past *seven* years (including EngageSmart). In each such transaction, General Atlantic either infused substantial capital into Summit-backed companies (like EngageSmart in 2018), permitted Summit to invest alongside General Atlantic in the same transaction, or purchased Summit's stake for a substantial profit, providing Summit with needed liquidity. Hamilton was conflicted as to Vista as well, for similar reasons, given Summit's longstanding and ongoing business relationship with Vista.

157. The October 2023 Merger Press Release also represented that the Special Committee led the process of negotiations leading to the Merger and that, only after its recommendation, did the Board Defendants approved the Merger:

> Transaction ***negotiations were led by the Special Committee*** and following its unanimous recommendation, the EngageSmart Board of Directors unanimously approved the merger agreement with Vista and agreed to recommend that EngageSmart stockholders vote to adopt the merger agreement.

158. This statement was false and misleading and omitted material facts because the Special Committee did not lead the negotiations in any sense. The negotiations were led and driven by General Atlantic and Goldman for General Atlantic's benefit, and the Special Committee merely rubberstamped the Merger desired by General Atlantic and EngageSmart's conflicted Board. Indeed, Evercore—the Special Committee's advisor—was consistently denied access to critical information by Goldman and was excluded from key communications Goldman conducted with bidders for the Company.

159. The Press Release further stated that "***Goldman Sachs & Co. LLC is acting as exclusive financial advisor to EngageSmart***." This statement was false because, as even its engagement letter acknowledged, Goldman was *not* exclusively representing EngageSmart. It was also representing General Atlantic, whose interests diverged from EngageSmart and the

Unaffiliated Stockholders to the point that "*Plaintiffs' litigation is almost a certainty*." Unbeknownst to stockholders, Goldman had expressly recognized that General Atlantic was "effectively buying out the public" and therefore maximizing purchase price was not in General Atlantic's interest, as higher Merger consideration "cuts the other way." Goldman also appreciated that General Atlantic's intent to rollover equity in the transaction "Allows GA to maximize future upside and drive strategic vision" and provides "Potential for GA to monetize some stake"—benefits not relevant to other EngageSmart shareholders. Goldman, moreover, consistently used the term "we" when referring to General Atlantic, including in emails explaining that the Special Committee would not interfere with their plans as "we"—*i.e.* General Atlantic—would control every aspect of the Merger process. Despite acknowledging these direct conflicts between General Atlantic and EngageSmart, and contrary to the advice from its in-house counsel, Goldman nevertheless agreed to represent both General Atlantic and the Company. Furthermore, contrary to its obligations under the NDAs and in defiance of its in-house counsel's advice, Goldman regularly communicated with deal participants wholly outside the presence of Evercore and the Special Committee and regularly had communications about Vista's bids with just General Atlantic representatives. Such communications were only permissible if Goldman was ***only*** representing General Atlantic. Any claim that Goldman was acting as an "exclusive" advisor to the Company is therefore false.

160. Finally, the Merger press release falsely stated that the Merger was "valued at approximately $4.0 billion," a figure that did not account for the additional $505 million paid to General Atlantic out of financing obtained to effect the Merger. The Unaffiliated Stockholders were therefore misled into believing that they were receiving a larger portion of the total cash Vista provided in connection with the Merger.

### B. False or Misleading Statements or Omissions of Material Facts in the December 19, 2023 Definitive Proxy

161. On December 19, 2023, EngageSmart issued the Proxy. In addition to statements by the EngageSmart Defendants, the Proxy acknowledged that General Atlantic and Vista each may be "deemed to be an affiliate of EngageSmart" under SEC rules, and those entities made specific representations in the Proxy.

#### 1. False and Misleading Statements or Omissions of Material Facts Concerning the Fairness of The Merger Process

162. The Proxy recommended that shareholders vote in favor of the Merger because the "Special Committee's process" was designed to "obtain the best value reasonably available." To support that claim, the Proxy boasted that the advisors contacted "ten parties" to "solicit interest in a potential minority investment transaction" and provided each with "an opportunity to conduct due diligence." Specifically, the Proxy claimed the Special Committee's recommendation was supported by:

> ***The Special Committee's process***, together with its and EngageSmart's advisors, for soliciting and responding to offers from potential counterparties in an ***effort to obtain the best value reasonably available*** to the unaffiliated security holders including the fact that ten parties were contacted in such process ***to solicit interest in a potential minority investment transaction in EngageSmart with General Atlantic continuing as the controlling stockholder of EngageSmart***, all of which entered into non-disclosure agreements with EngageSmart and were ***provided with an opportunity to conduct due diligence***, including reviewing the estimated projections of EngageSmart's financial prospects and conducting management diligence sessions based on non-public diligence information with members of EngageSmart's management[.]

163. Similarly, the Proxy stated that the full EngageSmart Board recommended shareholder approval of the Merger because of the "***procedural fairness***." Indeed, according to the Proxy, the full Board thought the deal was "advisable, fair to, and in the best interests of

EngageSmart and the Unaffiliated Stockholders" because of "***both the substantive and procedural aspects of the Merger***."

164. The statements in ¶ 162 and ¶ 163 were false and misleading. The Merger process was not designed to "obtain the best value," and did not exhibit "procedural fairness," because Vista was privy to an entirely different process than other bidders. While other bidders were told that a "minority investment transaction" was the only transaction structure on offer, Vista knew otherwise. Indeed, as early as July 2023, General Atlantic reached out to Vista—outside the Special Committee process—and communicated that General Atlantic was "looking for a way to do a deal with [Vista]" and that General Atlantic was "okay being a minority partner." Vista was therefore the only bidder who knew the true parameters of a potential deal. When other bidders, such as Francisco Partners, noted that they "prefere[d]" to make a majority bid, they were told "multiple times" that such a deal was unavailable. The "process" was so unfair that Francisco Partners even questioned whether EngageSmart and General Atlantic ever seriously considered "a real minority deal" or whether the entire process was a charade.

165. Moreover, the "procedural aspects" of the Merger were unfair because, contrary to the Proxy's claims, not all bidders had the same "opportunity to conduct due diligence." The Proxy failed to disclose that, as described above, Vista was allowed to "restore files from its prior work" in the 2022 sales process giving it "quite frankly, more access to information than we received in this process." Other bidders, on the other hand, were stuck with the sub-optimal level of diligence in the 2023 process and were accordingly "[d]isappointed with the level of data sharing" from EngageSmart and the lack of "full access" to necessary records.

166. Further, the statement that the full EngageSmart Board recommended the Merger *because* of the procedural fairness was false and misleading because it omitted that a major reason

the full Board (which included a majority appointed by General Atlantic) recommended the Merger was because General Atlantic was receiving an undisclosed $505 million side-payment.

167. Finally, the statement that the Special Committee process was employed "in an effort to obtain the best value reasonably available to the unaffiliated security holders" was false, or at best misleading, because in reality the process enabled the diversion of $505 million of the consideration reasonably available to all shareholders directly to General Atlantic. It also allowed General Atlantic to retain a highly valuable interest in EngageSmart, which it internally valued at an additional $1.3 billion in incremental value over five years. This makes clear that the board and its Special Committee knew the Merger substantially undervalued the Company. Put simply, the Special Committee here was little more than a sham to create the illusion of a fair process and the false assurance of a resultant best value among the Unaffiliated Stockholders.

168. The Proxy also misleadingly told investors that the Special Committee "actively" oversaw the sales process. According to the Proxy, the Special Committee's "***Active Involvement and Oversight***" of the sales process supported the fairness of the Merger. Specifically, the Proxy stated the Special Committee had "***active oversight of the negotiation process***" and "***was actively engaged in this process on a regular basis***." Moreover, the Proxy claimed that the full EngageSmart Board recommended the deal precisely because of the "procedural fairness of the Merger, including that … it was ***negotiated by the Special Committee***."

169. The Proxy also proclaimed that Vista and General Atlantic, *i.e.* the "Purchaser Filing Parties," considered the Merger "procedurally and substantively fair to the unaffiliated security holders of EngageSmart" specifically due to "the fact that ***consideration and negotiation of the Merger Agreement were conducted under the control and supervision of the Special Committee***," and because "the ***Special Committee had independent control of the extensive negotiations with the members of the Purchaser Filing Parties***."

170. The statements in ¶ 168 and ¶ 169 were false and misleading because the Special Committee and its representatives at Evercore did not have "active oversight of the negotiation process" and the negotiations were not conducted "under the control and supervision of the Special Committee." Indeed, as part of its plan to deliver a "fully baked" deal to the Special Committee, Goldman's "default mode" was to exclude Evercore from discussions with bidders. From the initial outreach, Goldman made sure to limit discussions to "1 person at GS + management + the bidders" such that "Evercore would not be part of those presentations." Goldman did not change its tactics even after the Special Committee mandated that the NDAs with bidders require Evercore's participation in deal discussions. Evercore was forced to complain that "the [NDA] clearly states no interaction but through advisors so how come GS in receipt of bidder questions without sharing with us." Even as late as October 18, 2023, the same week EngageSmart entered into the Merger Agreement with Vista, Evercore was still not provided access to the virtual data room or provided "analytics permissions" despite having "to ask multiple times." Furthermore, at that late and critical stage of negotiations, Evercore was still not being copied on "emails going back and forth between [Goldman] and bidders," and Goldman was not keeping Evercore "abreast of developments." This was especially problematic, because unbeknownst to stockholders, Goldman really represented General Atlantic's interests throughout the negotiations—not the Company's. Accordingly, the Special Committee did not have "independent control" over negotiations. Indeed, Goldman repeatedly overruled the Special Committee's advisor's directives, including that additional potential bidders be contacted, that the bid process letter invite bids for control of the Company, and that EngageSmart not solicit non-ratable side payments to General Atlantic.

### 2. False and Misleading Statements or Omissions of Material Facts Concerning Alternative Bidders

171. The Proxy creates the false impression that there were no credible alternative prospective bidders. The Proxy reports, in regard to the October 5, 2023 bid, that Francisco Partners "***expressed that its typical transaction would have involved a change of control.***" The Proxy then states that Francisco Partners ***"implied it could not find additional value above the highest per share price in its proposed valuation range***." Later, the Proxy claimed that Francisco Partners was "***moving significantly more slowly than Vista***" as a reason the Special Committee accepted the Vista offer.

172. The statements in ¶ 171 were false and misleading. Francisco Partners did not simply suggest that its "typical" transaction would have been for control but actually told Evercore and Goldman that it "***prefer[ed]…* a majority deal**," and that such a preference was not included "***on offer***." Thus, the Proxy's claim that Francisco Partners "could not find additional value" was misleading because it implied that Francisco Partners would not increase its offer even for a majority stake. In fact, the actual statement that a majority deal was not "on offer" implies the exact opposite—*i.e.*, that Francisco Partners was signaling that an increased offer was available for control. Indeed, upon learning that EngageSmart agreed to a majority deal with Vista, Francisco Partners was "disappointed" and "frustrated" that Goldman previously "told them multiple times there was no majority deal" and that it "wish[ed] they were told" that a majority deal was possible—facts not disclosed in the Proxy. Such frustration only makes sense if Francisco Partners was inclined to increase its offer for a majority stake in EngageSmart.

173. Moreover, it was misleading for the Proxy to state that Francisco Partners was moving "slowly" with due diligence as a reason to accept Vista's bid. Francisco Partners actually expressed the opposite to Evercore and Goldman when it informed them that it was prepared to go

"super fast" if it were provided full access to the necessary due diligence.

174. Next, although Vista was aware since at least July 2023 that General Atlantic was "okay being a minority partner," the Proxy falsely states on numerous occasions that General Atlantic told all prospective bidders that only a minority stake was available:

> On July 23, 2023… The Special Committee further discussed that ***General Atlantic had indicated that it was only willing at that time to expressly solicit interest for a potential transaction in which General Atlantic remained a controlling stockholder and was not presently willing to solicit interest in an alternative acquisition structure***.
>
> * * *
>
> On August 8, 2023… It was discussed that General Atlantic had ***indicated that it was not presently willing to solicit interest in a whole company transaction***, which meant that no outreach to strategic parties was proposed at such time and that General Atlantic was expected to prioritize outreach to investors that it viewed as likely to be interested in a minority investment with General Atlantic continuing as the controlling stockholder of EngageSmart.
>
> * * *
>
> On August 9, 2023, representatives of General Atlantic provided feedback to EngageSmart and Goldman Sachs on the contents of the outreach script and the list of prospective investors (with prioritization), which feedback reflected that ***General Atlantic was not presently willing to solicit interest in a whole company transaction*** and desired to prioritize outreach to investors that it viewed as likely to be interested in a minority investment with General Atlantic continuing as the controlling stockholder of EngageSmart.
>
> * * *
>
> On September 26, 2023…It was discussed that representatives of General Atlantic had communicated that General Atlantic desired at the current time ***to explore investor interest only in connection with selling a minority ownership stake in EngageSmart without a change of control and that it was not willing at the current time to expand the scope of a potential transaction to be solicited in a bid process letter***. Following discussion, the Special Committee determined that it would be in the best interests of EngageSmart's stockholders unaffiliated with General Atlantic to continue to explore investor interest in a potential transaction involving selling a minority stake in EngageSmart without a change of control including by sending the bid process letter to interested parties, and to continue to review other strategic alternatives.

* * *

> On October 10, 2023… the Special Committee determined that, given the level of outreach already conducted by EngageSmart, the feedback received, the fact that ***General Atlantic was not currently willing to solicit interest in a transaction other than selling a minority stake without a change of contro***l and the risk of disruption to the current transaction process (which could put the existing bids at risk by introducing delay and additional leak potential) and distraction to management involved with outreach to additional parties, that EngageSmart should not invite the parties who had expressed inbound interest into the process or contact additional parties at such time.

175. These statements in the Proxy noted in ¶ 174 were false and misleading and omitted material facts because, unbeknownst to investors, and to other bidders, Vista had been informed at the very outset of the process that a change of control transaction was a possibility. Indeed, Francisco Partners even questioned whether EngageSmart and General Atlantic ever seriously considered "a real minority deal" or whether the entire process was a charade.

**3. False and Misleading Statements or Omissions of Material Facts Concerning General Atlantic's Desire for Liquidity as a Motivating Factor**

176. The Proxy Statement misleadingly describes the circumstances regarding the acceptance of Vista's October 22, 2023 offer of $23 per share. According to the Proxy, "[f]ollowing receipt of the October 22 Proposal," Evercore was informed that "***General Atlantic would be willing to proceed to finalize a transaction on the basis of the October 22 Proposal*** if Mr. Bennett was supportive of the October 22 Proposal." The Proxy then notes that Mr. Bennett "***deferred to the Special Committee on how to best proceed with the negotiations***," which ultimately agreed to accept the offer.

177. The statements in ¶ 176 were materially misleading because they omitted the material facts that: (a) General Atlantic refused to push for additional Merger consideration because a higher purchase price would impair its IRR and receipt of liquidity from the Merger, including the non-ratable post-closing dividend; and (b) the Special Committee deferred to General

Atlantic in accepting the proposal. Indeed, unbeknownst to investors, General Atlantic contemplated making an additional counteroffer to Vista at $23.50 per share but declined to do so after discussing that the suggested increase in the purchase price would result in $70 million less liquidity for General Atlantic. Moreover, the claim that the ultimate decision on whether to accept the October 22 offer was left to the Special Committee was materially misleading, because it omits that the Special Committee "wait[ed] for" General Atlantic to provide its "blessing first" and to "say ok to price." Thus, the Special Committee did not independently contemplate and accept the offer.

178. Similarly, the Proxy states that General Atlantic determined to accept the Merger because the Merger consideration "***will provide liquidity for the unaffiliated security holders of EngageSmart without the delays that would otherwise be necessary in order to liquidate the positions of larger holders***."

179. The statement that General Atlantic approved the deal because it "will provide liquidity for the unaffiliated security holders" was materially misleading because it omitted that General Atlantic's motivation and desire for a secret post-closing dividend and liquidity generally impacted price negotiations and General Atlantic's ultimate agreement to the Merger price. In fact, General Atlantic representatives specifically discussed that seeking higher Merger consideration was harmful to General Atlantic because an increased purchase price from $23 to $23.50 per share would result in $70 million less liquidity for General Atlantic. Two of the General Atlantic Board Defendants even explicitly discussed in their private text chat that "[s]hares we keep [roll over] get extra cash from dividend that Vista doesn't use to purchase their 65%" (Nov. 13 Hrg. Tr. at 54) i.e. the more Vista paid for the public shares, the *less* General Atlantic would receive as a dividend. The Proxy does not disclose the side payment or General Atlantic's liquidity motivation, let alone the downward impact these motivations had on price negotiations.

### 4. False and Misleading Statements or Omissions of Material Facts Concerning Goldman's Conflicts

180. The Proxy misleadingly represented Goldman as EngageSmart's financial advisor when Goldman was really representing General Atlantic's interests, not those of the Company. For example, the Proxy stated that the Special Committee "discussed that ***EngageSmart proposed to engage Goldman Sachs*** given its long-standing relationship with EngageSmart," that the Special Committee's counsel at Skadden "discussed ***EngageSmart's proposed engagement of Goldman Sachs*** (which, as previously discussed with the Special Committee, had a long-standing relationship with EngageSmart and knowledge of its businesses)," and that "***Goldman Sachs would be a financial advisor to EngageSmart*** (and not the Special Committee)."

181. The statements in ¶ 180 describing Goldman's role were materially misleading because they give the false impression that Goldman was representing the Company's interests as a neutral financial advisor. As described above, Goldman was representing General Atlantic's interests throughout the process, including by soliciting and obtaining a non-ratable post-closing dividend to General Atlantic that operated to the detriment of EngageSmart's other shareholders.

182. In discussing Goldman's potential conflicts in the proposed transaction, the Proxy stated that "Goldman Sachs has recognized compensation for financial advisory and/or underwriting services provided by Goldman Sachs Investment Banking to Vista and/or its affiliates and portfolio companies, and to General Atlantic and/or its affiliates and portfolio companies of approximately $87.4 million and approximately $45 million, respectively." The Proxy further stated that Goldman "***may also in the future*** provide financial advisory and/or underwriting services to EngageSmart, Vista, General Atlantic and their respective affiliates and, as applicable portfolio companies," and "***also may*** have co-invested with Vista, General Atlantic and their respective affiliates."

183. The statements in ¶ 182 were misleading because they failed to disclose the true extent of Goldman's ties to General Atlantic beyond the advisory fees. In fact, the firm: (i) issued a $150 million term loan to General Atlantic, lent General Atlantic another €300 million to repay a different loan in 2021, and held a $50 million revolver loan to a General Atlantic fund due September 2025; (ii) concurrently was advising and marketing at least three separate General Atlantic funds; (iii) concurrently was advising General Atlantic portfolio company Capital Foods in assessing strategic alternatives; (iv) concurrently was advising General Atlantic in its take-private of HireRight; and (v) maintained co-investments with General Atlantic in at least six different companies, including at least one made in the middle of the EngageSmart sales process.

184. The statements also misleadingly omit material information about Goldman's conflicts vis-à-vis Vista. The Proxy failed to disclose that the same Goldman bankers purportedly advising EngageSmart (including at least one banker working on the Merger) were also concurrently advising Vista on another transaction for Vista portfolio companies Allvue and Alegeus. The Proxy also omits that Goldman: (i) provided an unsecured $1.5 billion loan to Vista's portfolio companies in July 2023; (ii) assisted Vista with a $1 billion investment in Finastra in September 2023; and (iii) provided a $50 million revolver loan to Vista due March 2027.

185. Given the deeply intertwined relationships between Goldman, Vista, and General Atlantic, the statements suggesting that Goldman "may also in the future" and "may also have co-invested" with General Atlantic and Vista in the past were materially misleading. They failed to reveal the intricate and ongoing connections Goldman maintained with both entities, thereby hiding the true extent and significance of Goldman's conflicts of interest.

186. The statements regarding Goldman's conflicts of interest were also misleading for entirely omitting Goldman's fees earned from Summit, including approximately $25 million in the prior two years.

### 5. False and Misleading Statements or Omissions of Material Facts Concerning the Special Committee's Independence

187. The Proxy falsely claims that the Special Committee was "independent." The Proxy states that Hamilton "confirmed that ***Summit would not have interests in a potential transaction that differed materially from those of the public stockholders***," noting only that "Summit and General Atlantic had invested in the same portfolio companies ***only in a limited number of cases*** (and that Mr. Hamilton had participated in one or more of such cases)." Accordingly, the Proxy declared time and again the that the Special Committee was "comprised ***solely of independent and disinterested directors***," that its "members were ***independent of General Atlantic*** and disinterested with respect to a potential transaction involving General Atlantic," and that the Special Committee members were "***not otherwise interested with respect to a potential transaction involving EngageSmart***."

188. The statements in ¶ 187 were false and misleading and omitted material facts because Hamilton was conflicted. Hamilton was a Managing Director of Summit which, like General Atlantic, was singularly interested in monetizing its investment in EngageSmart to obtain liquidity, as the Summit funds that invested in EngageSmart were past or nearing their typical 10-year life cycle in 2023. Summit, and therefore Hamilton, was incentivized to achieve a transaction that allowed Summit to liquidate its EngageSmart holdings and return capital to investors, even if the Merger left additional funds on the table or was not in the best interests of EngageSmart's public stockholders. In fact, General Atlantic recognized that Summit was aligned with its liquidity goals, as General Atlantic deal materials included a line item for "Summit Liquidity."

189. Further, while the Proxy vaguely points out that Summit and General Atlantic had investments in the "same portfolio companies," it fails to explain that Summit and General Atlantic transacted or coinvested directly with each other *seven* times over the past *seven* years (including

in EngageSmart), and that in each transaction, General Atlantic either infused substantial capital into Summit-backed companies (like EngageSmart in 2018), permitted Summit to invest alongside General Atlantic in the same transaction, or purchased Summit's stake for a substantial profit, providing Summit with needed liquidity. Thus, Summit wanted to maintain its lucrative relationship with General Atlantic, and therefore Hamilton was willing to bow to General Atlantic's wishes—and give Vista preferred bidder status—throughout the process. Indeed, the Special Committee expressly sought General Atlantic's "blessing" and for it "to say ok to price" before accepting the Vista offer. The Proxy also fails to disclose that Hamilton was conflicted as to Vista as well, for similar reasons, given Summit's longstanding and ongoing business relationship with Vista.

**6. False and Misleading Statements or Omissions of Material Facts Concerning the Non-Ratable Secret $505 Million Post-Closing Dividend To General Atlantic**

190. The Proxy stated that, on October 17, 2023, "Representatives of Skadden discussed with members of the Special Committee key aspects of the draft merger agreement under discussion between Skadden and Paul Weiss, including that a structure with a pre-closing dividend would have adverse consequences for certain stockholders unaffiliated with General Atlantic." This statement was false and misleading because it omitted that the pre-closing dividend (which would be distributed *pro rata* to all stockholders) was rejected not because it would have "adverse consequences" for Unaffiliated Stockholders, but because it would prevent General Atlantic from taking that money for itself as a secret post-closing dividend. (Proxy at 46).

191. The Proxy also provided a false and misleading account of the communications among Vista, General Atlantic and Goldman shortly after Vista's October 20 Proposal was delivered. The Proxy misleadingly recounts:

> Concurrent with the delivery of the October 20 Proposal, representatives of Vista held a call with representatives of General Atlantic, Evercore and Goldman Sachs to provide additional context for the October 20 Proposal. In this call, representatives of Vista communicated that Vista was unwilling to further discuss acquiring a minority stake without a change of control and that Vista desired to sign and announce a transaction by Monday, October 23, 2023.

192. The statement in ¶ 191 was false and misleading because the Proxy omits the fact that Vista, Goldman and General Atlantic discussed and agreed that Vista would pay the secret $505 million post-closing dividend to General Atlantic. This omission is consistent with Goldman's prior directive warning the parties to be judicious when documenting their discussions because "*Plaintiffs' litigation is almost a certainty*" and "[a]ll the books and documents that get made become public" so the parties need to consider "[w]hat should be talked about / written down."

**7. The Omission of the Post-Closing Dividend and Other Arrangements Rendered the Entire Proxy Misleading**

193. Independent of any particular false and misleading statement, the non-disclosure of the fact that General Atlantic was enticed to steer the deal to Vista and incentivized to keep a low price via a post-closing dividend rendered the Proxy misleading in its entirety.

194. To effect the purpose of Section 14(a) of the Exchange Act of ensuring informed corporate suffrage, the Securities and Exchange Commission requires filers to:

> Describe briefly any substantial interest, direct or indirect, by security holdings or otherwise, of each participant [ ] in any matter to be acted upon at the meeting, and include with respect to each participant the following information, or a fair and accurate summary thereof:
>
> ***
>
> State whether or not the participant or any associates of the participant have any arrangements or understanding with any person . . . with respect to any future transactions to which the registrant or any of its affiliates will or may be a party. If so, describe such

> arrangement or understanding and state the names of the parties thereto.

(17 C.F.R. § 240.14a-101(b)(xii)(B)).

195. General Atlantic was a participant, EngageSmart was the registrant, and Vista was another person, within the meaning of 17 C.F.R. § 240.14a-101(b)(xii)(B).

196. General Atlantic had an arrangement and understanding with Vista that General Atlantic would be paid $505 million in a future dividend transaction with EngageSmart.

197. Unaffiliated Stockholders reasonably inferred that no such arrangement or understanding existed because the Proxy failed to disclose and describe it as required—even though it did disclose other post-closing arrangements, such as the stake General Atlantic would hold in the private company.

198. General Atlantic also had an arrangement and understanding with Vista that General Atlantic would be entitled to pro-rata board representation, veto power over significant transactions, and rights of first refusal with respect to future equity offerings. Specifically, the undisclosed draft term sheet provided:

> The GA Rollover Participants, subject to maintaining at least 50% of the Company Shares held immediately following the Closing, will be entitled to designate such number of member(s) of the Board as is proportionate to their pro rata ownership of the Company upon the consummation of the [Merger].

(GS_00089250 at -50). That is, after the Merger closed, General Atlantic could sell up to half of its rollover equity at any time without reducing its suffrage on the Company's Board. Additionally, the confidential term sheet provided that General Atlantic's consent would be required for "Major Actions." (*Id*. at -53). Also, General Atlantic could "participate pro rata the same price and on the same terms in any sale of Company shares to third parties." That is, Vista would not be permitted to use its control of the Company to extract a premium from a buyer without sharing that benefit,

pro rata, with General Atlantic. (*Id*. at 52). Conversely, General Atlantic maintained the right to buy Company stock in any future offering sufficient to maintain its equity position. (*Id*. at -53). And General Atlantic received a guarantee of plenary access to Company information as long as it did not sell more than 75% of its rollover equity. (*Id*. at -55). None of these highly favorable and indisputably material terms—which collectively allowed General Atlantic to maintain significant control of the Company and function almost as an equal partner with Vista post-closing—were publicly disclosed.

199. Although the Proxy recounted the fact that post-merger governance was discussed, it failed to disclose and describe the arrangement as required—even though it did disclose other post-closing arrangements, such as the stake General Atlantic would hold in the private company.

### C. False or Misleading Statements or Omissions of Material Facts in the December 19, 2023 Schedule 13E-3 by EngageSmart, General Atlantic, and Vista

200. On December 19, 2023, EngageSmart, General Atlantic, and Vista jointly issued a Schedule 13E-3 for the Merger, signed by Defendant Hudson on behalf of EngageSmart as well as Vista's Vice President, Jeffery Wilson, Vista's Managing Member, Robert Smith, and General Atlantic's Managing Director, Michael Gosk. The filing was identified as "solicitation materials or an information statement subject to Regulation 14A" and expressly attached and incorporated the Proxy Statement, stating: "the Proxy Statement is attached hereto" and "the information in the Proxy Statement, including all annexes thereto is expressly incorporated by reference herein in its ***entirety***." Thus, the Schedule 13E-3 included the same false and misleading statements described in Sections II.A and II.B, *supra*, which were materially false and misleading for the same reasons.

## III. ADDITIONAL ALLEGATIONS OF SCIENTER

201. For purposes of Count II below, as alleged herein, numerous facts give rise to a strong inference that Defendants knew or recklessly disregarded that their statements and

omissions concerning the Merger process were materially false and misleading when made. Defendants acted with intent to deceive the Unaffiliated Stockholders to induce them to sell their shares in the Merger and at the Merger price. In addition to the allegations set forth above, these particularized facts include the following.

**A. General Atlantic Was Motivated to Keep the Merger Price Low**

202. The Merger was structured to allow General Atlantic to roll over 26% of its (pre-merger) equity into a 35% stake in the post-closing company. Thus, General Atlantic stood on both sides of the transaction and was motivated to keep the Merger price low, a notion expressly recognized in Goldman's internal communications. Recognizing this problematic structure, Goldman understood that "*Plaintiffs' litigation is almost a certainty*" and therefore instructed deal participants that "[a]ll the books and documents that get made become public" and stressed the need to consider "[w]hat should be talked about / written down."

203. General Atlantic was further motivated to keep the Merger price low because it sought and obtained a $505 million non-ratable benefit in the form of a post-closing dividend. As Defendants knew, the dividend would be, and was, paid out of financing obtained by Vista for the Merger and not distributed to Unaffiliated Stockholders as part of the Merger consideration.

204. Therefore, the *lower* the Merger Price, the *more* General Atlantic would obtain both in more rollover equity and in a higher secret post-closing dividend. As Defendant Osnoss stated in a private text message to Defendant Stamas: "shares we [General Atlantic] sell get 23[.] Shares we keep [roll over] get extra cash from dividend that Vista doesn't use to purchase their 65%." (GA_00013117 at -123). Thus, General Atlantic and EngageSmart's Unaffiliated Stockholders stood on opposite sides of a zero-sum game; the more cash that was paid pro rata to all shareholders, the less would be paid to General Atlantic as a dividend, and vice versa.

### B. General Atlantic and Summit's Needs for Liquidity Knowingly Impacted Deal Negotiations and Provided a Motive to Accept a Suboptimal Deal While Keeping Unaffiliated Stockholders in the Dark

205. Numerous facts confirm that General Atlantic and Summit needed liquidity and were willing to sacrifice on the purchase price of EngageSmart shares to accomplish that goal. Indeed, despite hearing from Goldman in May 2022 that EngageSmart shares were projected to be trading between $29.71 to $41.16 in the coming two years and in October 2022, that General Atlantic could monetize 38% of its holdings and still maintain 49% ownership of the Company, General Atlantic sold millions of shares in the Secondary offering in March 2023 at a price of just $19.00 per share to generate cash. Then, at the start of the 2023 process, Goldman recognized that the "Potential for GA to monetize some stake" was a key rationale for a deal and that General Atlantic's dual objectives of retaining ownership and seeking liquidity were at odds with each other in terms of whether a high price was advantageous to General Atlantic.

206. Other internal documents confirm that a desire for liquidity was a motivating rationale for the deal. In July 2023, Osnoss texted a General Atlantic colleague that an "ESMT exit" was one of the firm's 2023 objectives and General Atlantic's internal analysis calculated both General Atlantic's and Summit's liquidity levels generated by potential transactions. And General Atlantic's Portfolio Committee materials stated that General Atlantic expected "to receive liquidity at close to totaling ~$1,022M, via both the incremental debt raised at the company and our sell down of equity shares." Accordingly, the bid letters to prospective bidders instructed that offers should indicate the liquidity to General Atlantic generated by the proposal, both portraying General Atlantic's motive and signaling to potential bidders that they should structure their bids to maximize the benefit to General Atlantic, not necessarily to EngageSmart's stockholders at large.

207. Moreover, once the bids came in, Osnoss commented that the Francisco Partner's deal was "BS" for not providing General Atlantic any liquidity and that Hg Capital's bid was a

"bummer" for the limited liquidity it offered. When Vista made its initial majority bid on October 20, 2023, Stamas instructed his team to "run a version where it shows exactly what liquidity we get and how much we own." Then, instead of seeking a price increase when Vista reiterated its $23 per share price, Stamas and Osnoss discussed that a $0.50 per share price increase would result in $70 million less in liquidity for General Atlantic. After Vista made its majority offer, proposing that General Atlantic roll over equity representing 40% of the post-closing, General Atlantic doubled down and asked to retain only 35% post-closing ownership, supplying even more liquidity. Indeed, following the transaction, General Atlantic's CEO commented that it was "A real boost to performance and ***liquidity- just what we needed!!***"

208. Liquidity was a major concern for General Atlantic for a host of reasons. *First*, as Vista itself learned, General Atlantic's limited partners were itching for a return on their EngageSmart investment. Indeed, Vista's internal notes from the July 31, 2023 call with General Atlantic noted that Vista had "heard from some LPs [limited partners]" that "GA is looking for DPI (distributed to paid in-capital)." *Second*, as *Bloomberg* reported in articles dated July 7, 2022 and September 26, 2023, General Atlantic was "weigh[ing] an initial public offering" and had been "mulling an IPO in recent years." These were more than just rumors. On December 11, 2023—during the Class Period—*Reuters* reported that General Atlantic had "confidentially filed for a U.S. initial public offering." If General Atlantic were to go public, it needed to show returns in order to boost the value of its shares. *Third*, on October 11, 2023—in the heart of the 2023 process—*The Financial Times* reported that General Atlantic, as well as other private equity firms, utilized margin loans against their investments to boost returns to investors. This practice caused "some investors [to] worry they tilted returns too far towards financial engineering, rather than companies' underlying performance" and could "make it harder for investors to understand the percentage of return that come from fund finance versus the actual investment return." In fact,

General Atlantic had already taken a margin loan against its EngageSmart holdings, which at the time of the Merger had $52 million outstanding. Accordingly, General Atlantic needed large amounts of liquidity to show investors that its underlying strategy was working and therefore needed the Merger to be approved via the Proxy.

**C. General Atlantic's Rollover of Equity Was Extremely Valuable**

209. The Merger's structure, which allowed General Atlantic to roll over a portion of its holdings, was highly lucrative to General Atlantic. Vista had projected "base case" cash returns of between 3.2x and 3.8x on its EngageSmart investment, with internal rates of return of 22-23%. Similarly, General Atlantic's base case projected that its equity rollover "will generate ~19% incremental IRRs from here, resulting in an incremental $1.3Bn net gain[.]"

**D. General Atlantic, EngageSmart, and the Special Committee Knew the Special Committee Did Not Control the Sales Process or Negotiations**

210. From the very beginning of the process, Goldman expressly tried to sideline Evercore and the Special Committee in deal negotiations and communications. The Special Committee recognized as much and even required the NDAs to include a provision mandating that Evercore be involved with all deal communications. Nonetheless, Evercore was forced on numerous occasions to complain to Goldman that the Special Committee was being circumvented in substantive deal negotiations, even during the key time period around October 18, 2023—when the bidders were preparing their final bids. In fact, Skadden needed to alert the Special Committee to a significant meeting between General Atlantic and Vista scheduled for October 19, 2023, *i.e.* the day before Vista's majority bid. Throughout the entirety of the process, General Atlantic and EngageSmart both showed disdain for the Special Committee's involvement as both Stamas and CFO Hudson complained about the bureaucracy of the Special Committee, with Hudson "just doing what I need to at this point" and not keeping them actively involved.

### E. The Special Committee Knew the Process was Unfair Because it Allowed Vista to Restore its Prior Files, Which Provided More Comprehensive Data Than the 2023 Process, and Knew that General Atlantic Separately Negotiated a Non-Ratable Benefit for Itself

211. The Special Committee expressly allowed Vista to "restore" its files from the 2022 process, which provided more fulsome data than that provided to the bidders competing in the 2023 process. As Vista made clear in internal talking points, the 2022 process provided "quite frankly, more access to information than we received in this process." Vista's competitors in the 2023 process complained of being "[d]isappointed with the level of data sharing" from EngageSmart and of the lack of "full access" to necessary records. Their choice to allow, and to disclose, the post-closing dividend in the Proxy or elsewhere further demonstrates that the Special Committee Defendants understood that the process, which allowed General Atlantic to obtain such a benefit, was demonstrably unfair.

### F. The Special Committee and General Atlantic Ignored Evercore's Advice to Test the Market for Majority Interest

212. Evercore wanted to let potential bidders know that General Atlantic was open to considering a sale of its majority position in the Company. Thus, Evercore suggested edits to the script that would have informed investors that General Atlantic was "open to all value-creating alternatives" such as a "sale of the WholeCo." This suggestion was rejected by General Atlantic.

213. Evercore objected to the inclusion of language in the bid process letter advising prospective bidders that General Atlantic sought a non-ratable benefit. Again, General Atlantic overruled the Special Committee's advisor. The Special Committee's knowledge that the directives of its expert advisor, who was charged with assisting in ensuring a fair process, were repeatedly overruled by the self-interested General Atlantic and its conflicted advisor, Goldman, demonstrates that the Special Committee knew the process was unfair.

### G. Francisco Partners Was Disappointed They Were Never Informed That a Majority Deal Was on the Table

214. Upon learning that EngageSmart agreed to a majority deal with Vista, Francisco Partners, a sophisticated and repeat participant in corporate sales processes, recognized the impropriety of what had occurred. It voiced that it was "disappointed" and "frustrated" that Goldman previously "told them multiple times there was no majority deal" and that it "wish[ed] they were told" that a majority deal was possible. Francisco Partners even questioned whether the minority deal was ever really a legitimate possibility. The reaction of Francisco Partners is further evidence that Vista was favored by the Defendants throughout the process and indicative of scienter.

### H. CEO Bennett Was Motivated to Sell the Company to Vista Because a Majority Deal Qualified as a Change in Control, Entitling Bennett and Other Executives to Lucrative Payments

215. Defendant Bennett, who was actively looking to retire, was motivated to pursue a merger that would trigger the change of control provisions of his employment agreement, providing him with lucrative compensation. Defendant Hudson had similar provisions in her employment agreement, motivating her to support a change in control transaction like the one uniquely offered by Vista. Bennett knew that Vista wanted control of the company based on his involvement in the 2022 process with Vista, and he proactively reached out to Vista at a time when the Special Committee had not approved Vista as an outreach candidate. Bennett's employment agreement (along with Hudson's) provided that if the executive is terminated by EngageSmart without "cause" or by the executive for "good reason," within a certain number of months (three months for Bennett and two months for Hudson) prior to or within the 12-month period following a change of control, the applicable executive officer will be entitled to the following severance benefits, payable in cash, less applicable withholdings:

- A lump sum amount equal to a certain number of months (18 months for Bennett and 12 months for Hudson) of base salary;

- A certain number of months (18 months for Bennett and 12 months for Hudson) of continued health insurance coverage;

- The applicable executive's *pro rata* target bonus, payable in a lump sum; and

- 100% acceleration of all time-based equity awards.

The table below summarizes the total value of those payments for these Defendants:

| Name | Cash ($)(1) | Equity ($)(2) | Perquisites/ Benefits ($)(3) | Total ($) |
|---|---|---|---|---|
| Robert Bennett | 1,264,356 | 9,485,434 | 48,000 | 10,797,790 |
| Kevin O'Brien | 714,489 | 2,819,363 | 30,000 | 3,563,852 |
| Scott Semel | 451,553 | 2,595,642 | 22,500 | 3,069,695 |
| Cassandra Hudson | 933,086 | 6,434,109 | 30,000 | 7,397,195 |

In addition, Bennett, and Hudson were eligible for acceleration in full of their EngageSmart restricted stock unit ("RSU") Awards if the executive is terminated by EngageSmart without "cause" or by the executive for "good reason" within a certain number of months prior to or within 12 months of a change in control. In final negotiations with Vista, Bennett pushed for a full cash-out of the equity awards. Similarly, Bennett and Hudson's EngageSmart option awards would vest in full in connection with the change in control. The table below summarizes the values of those benefits:

| Name | EngageSmart RSU Awards ($)(1) | EngageSmart Option Awards ($)(1) |
|---|---|---|
| Robert Bennett | 6,236,059 | 3,249,375 |
| Kevin O'Brien | 2,819,363 | — |
| Scott Semel | 2,595,642 | — |
| Cassandra Hudson | 2,770,281 | 3,663,828 |

216. Defendant Hudson showed her knowledge that the Special Committee was not running the process and that its activities were a charade when she sent an email to Goldman's Sikora admitting that the Special Committee meetings were "so stupid[.] I really hope my next sale process doesn't involve a special committee."

217. Defendant Stamas was aware that General Atlantic's need for liquidity would be facilitated by a less-than-vigorous sales process. In 2022, Stamas told Goldman that General Atlantic wanted "an abbreviated public process" and was merely "worried about the optics." Stamas also knew about Bennett's meeting with Goldman and Vista on September 5, 2023 (which excluded Evercore and the Special Committee).

218. Stamas and Osnoss demonstrated their knowledge that Goldman was not impartial nor objective when they parodied Goldman's attitude, which Stamas characterized as "deal deal deal deal. Money money. Totally objective 😊."

219. Hamilton expressed during the 2022 process that he only wanted an advisor that could benefit Summit in later transactions, betraying his own conflict in this regard. Hamilton quickly sought to help Summit benefit from Evercore's retention by the Special Committee, writing to a Summit colleague who was "chasing" a deal where Evercore was advising the seller that Hamilton had delivered "$25M to EVR for a short sprint" and "I hope you use that to win your deal."

220. In their roles as directors and officers of the Company during the sales process and Class Period, the Special Committee Defendants, Board Defendants, and Officer Defendants directly participated in the management of EngageSmart's operations and, because of their positions at EngageSmart, were involved in the drafting, reviewing, publishing and/or disseminating of the materially false and misleading statements and information alleged herein, possessed the power and authority to control the contents of EngageSmart's press releases and Proxy in connection with the Merger.

221. The foregoing facts, particularly when considered holistically and in the light most favorable to the Plaintiffs (as they must be), support a strong inference of Defendants' scienter.

## IV. LOSS CAUSATION

222. As described herein, Defendants made or caused to be made materially false and misleading statements and omissions of material facts in the Proxy. These materially false and misleading statements and omissions as set forth above caused Plaintiffs and other members of the Class to vote in favor of the Merger and/or accept Merger consideration that failed to adequately value EngageSmart common stock. As a result, Plaintiffs and other Class Members suffered damages under Section 14(a) of the Exchange Act.

223. The false and misleading statements alleged herein deflated the market price members of the Class received for their EngageSmart shares in the Merger and in open-market sales, by concealing facts indicating that the shares were more valuable than the Merger price, and that a higher price could be obtained.

224. As described above, EngageSmart was far more valuable than the Merger price. *First,* preceding the announcement of the Merger, Vista's Investment Committee authorized Vista to pay up to $24 per share for EngageSmart. *Second*, Vista could have paid even more than $24 per share and still meet its target returns. *Third,* Vista was able and willing to pay, and did pay, an additional $505 million for its 65% stake in EngageSmart. *Fourth*, Vista significantly accelerated the Company's planned timeline to block out any other bidders. *Fifth*, unbeknownst to investors, other bidders, such as Francisco Partners, indicated that their bids would have included a control premium and would have been higher had they known a majority transaction was possible. *Sixth*, General Atlantic expected its 35% stake in the new company, which it obtained in exchange for the approximately 43.62 million shares it was rolling over, to return an additional $1.3 billion in five years (GA_00012822 at -25, -27). *Finally*, Vista was able to parlay its knowledge of the true contours of the sale parameters, the limited bidders, and General Atlantic's desire for immediate liquidity to minimize the price paid to Unaffiliated Stockholders. General Atlantic was not

motivated to press for the maximum Vista would pay because a higher per share price could result in less liquidity to General Atlantic.

225. During the Class Period, Defendants also made materially false and misleading statements and omissions and engaged in a scheme to deceive investors. Defendants' materially false and misleading statements and omissions of material facts operated as a fraud or deceit on Plaintiffs and the Class, and induced Plaintiffs and the Class to sell EngageSmart shares at prices that were below the actual value of those securities, including by selling their shares into the Merger for the inadequate Merger Consideration. In addition, had Plaintiffs and members of the Class not been induced to sell at deflated prices, they could have secured fair value of their shares through appraisal. Plaintiffs and the Class suffered economic harm as a result of their sales of EngageSmart common stock during the Class Period, *i.e.*, damages under Section 10(b) of the Exchange Act.

226. Had the truth been known to the market, EngageSmart shares would have traded at higher prices throughout the Class Period. Members of the Class who sold their shares during the Class Period would therefore have obtained a higher price for their shares.

227. Had the truth been known to the market, Defendants would have been unable to obtain approval for the Merger at the agreed price and would have obtained a higher price per share. Alternatively, stockholders would have voted down the Merger, and no transaction would have been effectuated, such that members of the Class who retained their shares would not have been deprived of the fair value of their shares in a forced sale.

228. Had the truth been known to the Unaffiliated Stockholders about the $505 million side payment to General Atlantic in particular, the Unaffiliated Stockholders could have obtained an injunction from the Delaware Court of Chancery blocking the Merger.

229. Had Defendants been compelled to pay the $505 million, or any portion thereof, to all stockholders pro rata, either through the withholding of votes or an injunction blocking the preferential treatment of General Atlantic, stockholders would have benefited from that pro rata distribution.

230. Based on Defendants' misrepresentations, EngageSmart's stock price became tethered to the underpriced Merger Consideration, as indicated in the following chart:




231. As the market price was artificially depressed, members of the Class who sold their shares during the Class Period obtained a lower value for their shares.

232. Members of the Class who held EngageSmart shares on the Record Date were deprived of the information necessary to exercise a fully informed vote, as well as a fully informed decision whether to dissent and seek appraisal for the fair value of their EngageSmart shares, and other available relief. Had the truth been known to the market, Defendants would have been unable to obtain approval for the Merger at the agreed price and Plaintiffs would have obtained a higher

price per share. Alternatively, stockholders would have voted down the Merger and no transaction would have been effectuated.

## V. INAPPLICABILITY OF STATUTORY SAFE HARBOR

233. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain statements alleged to be false may be characterized as forward-looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Further, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by a director or officer of the Company who knew that the statement was false when made.

## VI. CLASS ACTION ALLEGATIONS

234. Plaintiffs bring this action on their own behalf and as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of Unaffiliated Stockholders entitled to vote on the Merger and the Class consisting of sellers of EngageSmart common stock from October 23, 2023 through the close of the Merger on January 26, 2024, including those stockholders who sold shares in the Merger. Excluded from the Class are the Defendants and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the Defendants.

235. This action is properly maintainable as a class action.

236. The Class is so numerous that joinder of all members is impracticable. According to the Proxy, there were 168,334,721 shares of EngageSmart common stock outstanding as of December 7, 2023. Upon information and belief, there are hundreds or thousands of members of the Class.

237. There are questions of law and fact that are common to the Class, including, among others:

(a) Whether Defendants violated Section 14(a) of the Exchange Act and/or Rule 14a-9 promulgated thereunder;

(b) Whether Defendants violated Section 10(b) of the Exchange Act and/or Rule 10b-5 promulgated thereunder;

(c) Whether the Special Committee Defendants, Board Defendants, Officer Defendants and General Atlantic violated Section 20(a) of the Exchange Act;

(d) Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(e) Whether Defendants knew, recklessly and/or negligently disregarded that their statements and/or omissions were false and misleading;

(f) Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g) The extent of damage sustained by Class Members and the appropriate measure of damages.

238. This action seeks disgorgement of General Atlantic's ill-gotten gains. Separate successful prosecutions could exhaust such ill-gotten gains, leaving some plaintiffs unable to recover such damages based on the same conduct by General Atlantic.

239. Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class have been damaged by Defendants' wrongful conduct.

240. Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation. Plaintiffs have no interests that conflict with those of the Class. All members of the Class have suffered the same harm.

241. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the parties opposing the Class. Conflicting adjudications for individual members of the Class might be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. Therefore, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

242. The questions of law and fact common to the members of the Class predominate over any questions affecting only its individual members, such that a class action is superior to any other available method for fairly and efficiently adjudicating the controversy.

## VII. PRESUMPTION OF RELIANCE

243. Plaintiffs and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972) because the claims asserted herein against Defendants are predicated in part upon material omissions of fact that Defendants had a duty to disclose. Because this action involves Defendants' failure to disclose information regarding EngageSmart's business and sales process, among other things, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material such that a reasonable investor might have considered them important in making investment decisions. Given the importance of Defendants' material misstatements and omissions of material facts set forth above, that requirement is satisfied here.

244. In the alternative, Plaintiffs and the Class are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions of material facts pursuant to the fraud-on-the market doctrine because, at all relevant times, the market for EngageSmart securities was open, efficient and well developed for the following reasons, among others:

(a) EngageSmart was listed and actively traded on the NYSE, a highly efficient market;

(b) As a regulated issuer, EngageSmart filed periodic public reports with the SEC and/or the NYSE;

(c) The price of EngageSmart common stock reacted to the announcement of the Merger and remained near the estimated per share Merger Consideration during the Class Period;

(d) EngageSmart regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(e) EngageSmart was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

245. Because the market for EngageSmart was efficient, it is assumed that: (1) any misrepresentations were incorporated into the market price; (2) Plaintiffs and Class members relied on that market price when deciding when to buy or sell, and; therefore, (3) Plaintiffs and Class members indirectly relied on any misrepresentations when deciding to sell EngageSmart common stock, including the decision to tender shares into the Merger, rather than seeking appraisal.

246. The stock price strongly reacted to the announcement of the Merger and Merger related news. Furthermore, during the period after the announcement of the Merger, it is clear that the stock price was influenced by the Merger price. These facts strongly support a presumption of market efficiency because they show the market reacted efficiently to information, and the Merger is obviously important information that would be reflected in the stock price.

247. In addition, while a merger is pending, a vital right affecting share ownership is the right to seek appraisal. Market participants often buy or sell the stock based on their valuation of an appraisal claim. Trading based on the value of the right to seek appraisal affects the overall market price of the stock. Indeed, if information is disclosed that causes investors to perceive an appraisal claim as more valuable, investors interested in seeking appraisal will consequently value the shares at a higher level, placing upward pressure on the stock price. If information is disclosed showing that appraisal would be less valuable, the share price could experience downward pressure. Other investors who are not interested in seeking appraisal may adjust their own valuation of the shares based on their perception of what other investors are willing to pay due to the possibility of appraisal. Accordingly, the possibility of appraisal ties information relating to the Company to the value of its shares even in instances where a merger is likely to close.

248. The relationship between the right to appraisal and the market price for a company's shares was explained in a University of Washington Law Review Article:

> In a developed appraisal market, appraisal arbitrageurs will seek to accumulate a position in the target company following the announcement of a transaction, and will continue to purchase shares until the market price has been driven to the risk-adjusted expected present value of an appraisal claim. . . . Minority shareholders would thus share in the expected gains from appraisal without having to file a petition themselves, just as the benefits from the market for corporate control accrue to ordinary shareholders. Indeed, minority shareholders could be better off by sharing in these gains than if they had sought appraisal themselves because professional arbitrageurs, as sophisticated repeat players, may be able to reduce overall costs in pressing claims or achieve better results in appraisal than individual investors could on their own.

*See* Charles R. Korsmo, Minor Myers, *Appraisal Arbitrage and the Future of Public Company M&A*, 92 Wash. U.L. Rev. 1551 (2015).

249. Aside from appraisal, investors rely on Company-specific information during the pendency of a merger. Often referred to as "merger arbitrage," investors often buy shares below a proposed merger price and either sell those shares in the merger or at a higher value as new

information pertaining to the merger emerges. These investors may often make a purchase based on the prospect of a higher offer arising before the merger closes or based on the "fallback" value of the company should the merger fail, both of which are based on and tied to information about company fundamentals. Accordingly, information relating to the company would be relevant to the valuation of the security and the price at which the security trades while a merger is pending.

250. During the Class Period, many sophisticated investors specializing in investing during the pendency of a merger made investments in EngageSmart, thereby enhancing the market efficiency of EngageSmart.

## COUNT I
## Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder

251. Plaintiffs repeat and re-allege the allegation set forth in Paragraphs 1 through 250 as if fully set forth herein.

252. Defendants disseminated a false and misleading Proxy containing statements that, in violation of Section 14(a) of the Exchange Act and Rule 14a-9, and in light of the circumstances under which they were made, misrepresented or omitted material facts necessary to make the statements therein not materially false or misleading.

253. The Proxy was prepared, reviewed, and/or disseminated by Defendants. Each of the Defendants authorized the dissemination of the Proxy and the use of their names in the Proxy, and were involved in the sales process leading up to the closing of the Merger. By virtue of their positions within EngageSmart and/or access to Company and Merger information, these Defendants were aware of the misstated and omitted information alleged herein and their duty to make accurate statements and disclose all material information in the Proxy.

254. The Special Committee Defendants and the Officer Defendants were at least negligent in issuing a false and misleading Proxy. Count I is not based on any knowing or reckless

misconduct on the part of the Special Committee Defendants or the Officer Defendants. Count I does not depend on wrongdoing that sounds in fraud with respect to these Defendants.

255. Defendants Vista, General Atlantic, McKenzie, Mangum, Osnoss, and Stamas knew that the Proxy was false and misleading, and issued it, permitted it to issue, and allowed their names to be used in that connection for the purpose of obtaining stockholders approval for the Merger. They were at least reckless in that they willfully ignored the substantial risk that stockholders would be misled by the Proxy, or they intended to mislead stockholders to achieve their own financial gain. Nevertheless, scienter is not required to prove liability on this Count, and Plaintiffs allege in the alternative that these Defendants acted negligently.

256. Count I is premised on the fact that there were material misrepresentations and omissions in the Proxy, and the Defendants were at least negligent in failing to recognize this fact.

257. Defendants failed to exercise reasonable care to ensure the Proxy did not contain the material misstatements and omissions alleged herein.

258. The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would have considered them important in deciding how to vote on the Merger. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy and in other information reasonably available to EngageSmart shareholders.

259. In addition, EngageSmart, General Atlantic, and Vista jointly issued a Schedule 13E-3 for the Merger. The filing was identified as "solicitation materials or an information statement subject to Regulation 14A" and expressly attached and incorporated the Proxy Statement, stating: "the Proxy Statement is attached hereto" and "the information in the Proxy Statement, including all annexes thereto is expressly incorporated by reference herein in its ***entirety***."

260. The Proxy was an essential link in causing EngageSmart shareholders to approve the Merger and to forego their appraisal rights.

261. By reason of the foregoing, Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

262. General Atlantic used the Proxy to unjustly and unlawfully enrich itself at the expense of the Unaffiliated Stockholders through the receipt of an undisclosed side payment, which money should be disgorged, consistent with the equitable remedies traditionally available to stockholders aggrieved by violations of Section 14(a) and related rules and regulations prohibiting trading and manipulations using material non-public information ("MNPI") not available to non-insider investors.

263. Because of the false and misleading statements in the Proxy, Plaintiffs and the Class were harmed by an uninformed shareholder vote approving the Merger.

264. This claim is brought within the applicable statute of limitations.

**COUNT II**
**Against All Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder**

265. Plaintiffs repeat and re-allege all allegations contained in Paragraphs 1 through 250 as if fully set forth herein.

266. During the Class Period, Defendants carried out a plan, scheme and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class Members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to sell EngageSmart securities at artificially deflated prices.

267. Defendants made untrue statements of material facts and/or omitted material facts necessary to make the statements not misleading in an effort to maintain artificially low market

prices for EngageSmart securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

268. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to disseminate the misleading statements and concealed material information about the Company, its operations and prospects, as well as material information concerning the Merger and the sales process.

269. During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

270. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal and misrepresent EngageSmart's true financial condition and material information regarding the Merger and the sales process from the investing public and to support the artificially low prices of the Company's securities.

271. In addition, EngageSmart, General Atlantic, and Vista jointly issued a Schedule 13E-3 for the Merger. The filing was identified as "solicitation materials or an information statement subject to Regulation 14A" and expressly attached and incorporated the Proxy Statement, stating: "the Proxy Statement is attached hereto" and "the information in the Proxy Statement, including all annexes thereto is expressly incorporated by reference herein in its ***entirety***."

272. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective sales of the Company's securities during the Class Period.

273. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

274. This claim is brought within the applicable statute of limitations.

## COUNT III
**Against Vista, General Atlantic, EngageSmart, McKenzie, Mangum, Osnoss, and Stamas, for Violations of Section 10(b) and Rules 10b-5(a) and 10b-5(c) thereunder**

275. Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 250 above as if fully set forth herein.

276. In addition to misleading the Unaffiliated Stockholders and the investing public through their misstatements and misleading omissions as described above, Defendants (i) employed devices, schemes and artifices to defraud; and (ii) engaged in acts, practices and a course of business that operated as a fraud and deceit upon the sellers of the Company's securities.

277. Specifically, General Atlantic demanded and accepted, and Vista offered and paid, a secret, non-ratable post-closing dividend of $505 million. By hiding a substantial portion of the overall consideration Vista paid to acquire its 65% stake in the Company, these Defendants deceived the Unaffiliated Stockholders and the investing public into believing that (i) the Unaffiliated Stockholders were receiving a larger portion of the overall consideration Vista was willing to pay and (ii) that General Atlantic was willing to accept $23 per share for the shares it was selling as its only liquid compensation from the deal (suggesting that insiders believed such a $23 price to be fair).

278. General Atlantic performed its manipulative and deceptive acts through the acts of Defendants McKenzie, Mangum, Osnoss, and Stamas, each of whom furthered the scheme both

as directors of EngageSmart and General Atlantic partners and high-level employees. These individuals, along with EngageSmart itself: (i) caused EngageSmart to retain the conflicted Goldman Sachs; (ii) caused Goldman Sachs to solicit non-ratable benefits for General Atlantic in the bid process letter; and (iii) caused EngageSmart to curtail the bid process upon learning that Vista would pay a substantial non-ratable benefit to General Atlantic.

279. Vista was motivated to engage in the scheme because, by offering the non-ratable payment, Vista was able to obtain the deal it wanted, as Goldman and General Atlantic squeezed out bidders who might be willing to pay more to the Unaffiliated Stockholders (or in total) and Vista received leaked information about the existing bids so that it could keep its own bid as low as possible.

280. General Atlantic was financially motivated to engage in this scheme because it obtained a $505 million non-ratable payment, which provided more liquidity and more IRR for General Atlantic than General Atlantic would have received if that money were paid in the form of a pre-close dividend or a higher Merger price.

281. Defendants Dunnam, McKenzie, Mangum, Osnoss, and Stamas were motivated to engage in this scheme to please their employer, General Atlantic, and because the additional money paid to General Atlantic might ultimately be made available to them personally in the form of distributions, salary and bonuses.

282. This course of conduct directly and indirectly used instrumentalities of interstate commerce, including the banks, the New York Stock Exchange, internet and telephone services and the means of interstate travel.

283. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered economic injury in connection with their respective sales of the Company's securities in the Merger and otherwise during the Class Period. As a result of

this unlawful scheme and General Atlantic's knowledge of the material nonpublic information that it would receive a side-payment, General Atlantic unjustly and unlawfully enriched itself at the expense of the Unaffiliated Stockholders through the receipt of an undisclosed side payment, which money must be disgorged, consistent with equity and the remedies traditionally available where, as here, Defendants used material non-public information to manipulate the process and obtain significant non-ratable benefits not available to public investors.

## COUNT IV
## Against the Special Committee Defendants, Board Defendants, Officer Defendants, and General Atlantic for Violations of Section 20(a) of the Exchange Act

284. Plaintiffs repeat and re-allege all allegations contained above as if fully set forth herein.

285. Defendants disseminated false and misleading statements and a false and misleading Proxy in violation of Sections 10(b) and 14(a) of the Exchange Act and Rules 10b-5 and 14a-9, promulgated thereunder.

286. The Special Committee Defendants, Board Defendants, and Officer Defendants, and General Atlantic approved the content of and authorized the publication of EngageSmart's October 2023 Merger Press Release.

287. Defendant Hudson signed EngageSmart's October 23, 2023 Form 8-K attaching the Merger Press Release and the December 19, 2023 13E-3. To the extent she is not liable as a primary violator of Section 10(b), she is, in the alternative, liable for the control she exercised under Section 20(a).

288. The Special Committee Defendants and the other Board Defendants approved the contents, and ordered the dissemination, of the Proxy, which was identified in the cover letter as issued "By Order of the Board of Directors." The Special Committee Defendants and the other Board Defendants had the authority to prevent EngageSmart from soliciting non-ratable post-

closing benefits for its majority shareholder and to refuse to accept a proposal offering the same. However, these Defendants allowed and ratified the deceptive and manipulative conduct which resulted in a fraudulent scheme involving the purchase and sale of securities.

289. Defendant General Atlantic had the ability to control, and did control, EngageSmart at all relevant times through its majority equity stake and voting power and by appointing a majority of its directors, including Defendants McKenzie, Mangum, Osnoss, Bennett, and Stamas. In addition to controlling the composition of the Board, General Atlantic was entitled to exercise control over significant transactions. Specifically, under the Stockholder Agreement, EngageSmart was precluded from any "Major Actions"—including a merger—without General Atlantic's express written consent. Further, General Atlantic controlled the sales process by appointing its own conflicted banker, Goldman, ostensibly to advise EngageSmart, and participated in concealing this and other facts through the Board Members it appointed and controlled. General Atlantic refused to allow the Special Committee to solicit offers for anything other than a minority investment in EngageSmart that would cash out public stockholders, provide significant liquidity to General Atlantic, and keep General Atlantic in control. Defendant General Atlantic's Managing Director, Michael Gosk, signed the December 19, 2023 13E-3, which incorporated the Proxy.

290. These Defendants acted as controlling persons of EngageSmart and culpably participated in the Exchange Act violations within the meaning of Section 20(a) of the Exchange Act as alleged herein. In particular, each of the Special Committee Defendants, Board Defendants, Officer Defendants, and General Atlantic had direct and supervisory involvement in the day-to-day operations of EngageSmart, and, therefore, had the power to control or influence the particular transaction giving rise to the Exchange Act violations alleged herein, and exercised the same. These Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.

The statements and the Proxy purport to describe the various issues and information that these Defendants reviewed and considered before recommending the Merger to the Class.

291. These Defendants were provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. The Proxy also expressly stated that it was issued "By Order of the Board of Directors," and was signed by Defendant Stamas as Chairman of the Board of Directors.

292. The Special Committee Defendants, Board Defendants, Officer Defendants and General Atlantic had the ability to exercise control over and did control a person(s) who has violated Sections 10(b) and 14(a) of the Exchange Act and Rules 10b-5 and 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the conduct, Plaintiffs and the Class were harmed by selling their shares at deflated prices and by an uninformed shareholder vote approving the Merger.

293. By virtue of the foregoing, the Special Committee Defendants, Board Defendants, Officer Defendants, and General Atlantic have violated Section 20(a) of the Exchange Act.

294. This claim is brought within the applicable statute of limitations.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment and relief:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Determining that all Defendants violated Section 14(a) of the Exchange Act, as well as Rule 14a-9 promulgated thereunder;

C. Determining that Defendants violated Section 10(b) of the Exchange Act, as well as Rule 10b-5 promulgated thereunder;

D. Determining that the Special Committee Defendants, Board Defendants, Officer Defendants and General Atlantic violated Section 20(a) of the Exchange Act;

E. Awarding damages in favor of Plaintiffs and the Class against all Defendants, jointly and severally, for all damages sustained due to Defendants' wrongdoing, in an amount to be proven at trial, including prejudgment interest thereon;

F. Awarding restitution and equitable relief to Plaintiffs and the Class;

G. Directing Defendants to account to Plaintiffs and the Class for all damages suffered as a result of their wrongdoing;

H. Ordering Defendant General Atlantic to disgorge its ill-gotten gains.

I. Awarding Plaintiffs pre- and post-judgment interest and the costs of this action, including reasonable allowance for Plaintiffs' attorneys' and experts' fees; and

J. Granting such other and further relief as this Court may deem just and proper.

## IX. JURY DEMAND

Plaintiffs respectfully request a trial by jury on all issues so triable.

Dated: December 23, 2025

Respectfully submitted,

**FARNAN LLP**

/s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0336
Facsimile: (302) 777-0301
Emails: bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

***Liaison Counsel for Lead Plaintiffs***

Andrew J. Entwistle (*pro hac vice submitted*)
Callie Crispin (*pro hac vice submitted*)
**ENTWISTLE & CAPPUCCI LLP**
500 West 2nd Street, Suite 1900
Austin, TX 78701
Telephone: (512) 710-5960
Facsimile: (212) 894-7278
Email: aentwistle@entwistle-law.com
ccrispin@entwistle-law.com

Vincent R. Cappucci (*pro hac vice submitted*)
Brendan J. Brodeur (*pro hac vice submitted*)
**ENTWISTLE & CAPPUCCI LLP**
230 Park Avenue, 3rd Floor
New York, New York 10169
Telephone: (212) 894-7200
Facsimile: (212) 894-7272
Email: vcappucci@entwistle-law.com
bbrodeur@entwistle-law.com

David J. Schwartz (*pro hac vice*)
**SAXENA WHITE P.A.**
10 Bank Street, Ste. 882
White Plains, New York 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
Email: dschwartz@saxenawhite.com

Thomas Curry (Bar No. 5877)
**SAXENA WHITE P.A.**
824 N. Market St., Suite 1003
Wilmington, DE 19801
Telephone: (302) 485-0483
Facsimile: (888) 424-8566
Email: tcurry@saxenawhite.com

Adam Warden (*pro hac vice*)
Jonathan Lamet (*pro hac vice*)
**SAXENA WHITE P.A.**
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
Email: awarden@saxenawhite.com
jlamet@saxenawhite.com

***Co-Lead Counsel for Lead Plaintiffs***